**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick, Arizona Bar #004738
J. James Christian, Arizona Bar #023614
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Fax: (602) 255-0103
rgh@tblaw.com; jjc@tblaw.com

**SCOTT+SCOTT LLP**
Arthur Shingler III
Mary K. Blasy
Hal D. Cunningham
600 B Street, Suite 1500
San Diego, CA 92101
Telephone: (619) 233-4565
Fax: (619) 233-0508

Counsel for Plaintiff

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| ROBERT P. BACA, derivatively on behalf of Nominal Defendant INSIGHT ENTERPRISES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> TIMOTHY A. CROWN, ERIC J. CROWN, RICHARD A. FENNESSY, GLYNIS A. BRYAN, KAREN K. MCGINNIS, STANLEY LAYBOURNE, MARK T. MCGRATH, CHARLES LAYNE, LARRY A. GUNNING, ROBERTSON C. JONES, MICHAEL M. FISHER, BENNETT DORRANCE, KATHLEEN S. PUSHOR, DAVID J. ROBINO, and ANTHONY A. IBARGÜEN, <br><br> Defendants, <br><br> and <br><br> INSIGHT ENTERPRISES, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. 2:09-cv-01283-DGC <br><br> **AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTIES, CORPORATE WASTE, ABUSE OF CONTROL, GROSS MISMANAGEMENT, AND UNJUST ENRICHMENT** <br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

> "*The sales model here is all Crown ... if you're good you get rich, and if you're not you get out. Miss your goal by one cent, no bonus. Exceed your goal, and you might go on a Caribbean cruise, take a trip to New Orleans, or personally get handed 500 bucks by Eric Crown himself.*"
>
> ~Cyr, Diane, "Thirtysomething Else," *Direct*, Oct. 1995, p. 1.

Plaintiff, for his verified derivative complaint, by his undersigned attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     Plaintiff Robert P. Baca, by his undersigned attorneys, submits this Amended Verified Shareholder Derivative Complaint.  This is a shareholders' derivative action brought in the name of and for the benefit of nominal defendant Insight Enterprises, Inc. ("Insight" or the "Company") against certain current and former executive officers and members of the Board of Directors of Insight (the "Individual Defendants").  The action arises from the defendants' intentional, reckless or negligent breaches of fiduciary duty, waste of Insight's corporate assets, and abuse of their control of Insight, gross mismanagement, *ultra vires* misconduct and unjust enrichment in connection with their causing, approving, and/or acquiescing in Insight's:

- refusing to recover $30+ million in executive compensation the Individual Defendants improperly caused Insight to pay its senior executives and employees between 1995 and 2005, causing the Company to overstate its publicly-reported earnings during its entire history as a publicly-traded company, in connection with executive and employee stock option grants that were improperly "backdated," and which resulted in Insight being forced to expend over $15 million in professional fees to restate its 1995-2005 earnings in 2006 (the "Backdating Period"), and to defend an SEC investigation;

- improperly withholding certain customer refunds and supplier invoice payments and then improperly reporting the resulting illusory financial gains as "profits" in the Company's publicly-disseminated financial reports issued between 1996 and 3Q 2008, resulting in the overpayment of over $40 million in excessive executive compensation while Insight's earnings were *again* being materially overstated, *again* resulting in a second $60+ million restatement reported in February 2009 (the "Illusory Profiteering Period"), *again* almost its entire history as a publicly-traded company, and exposing Insight to yet *another* SEC investigation and hundreds of millions of dollars in potential liability in several stock fraud class actions;

- being forced to admit in connection with both the 2007 Backdating and the 2009 Illusory Profiteering earnings restatements that the Individual Defendants were operating Insight without adequate internal controls and that the accounting improprieties leading to both restatements were intentional; and

- paying over $70 million in improper excessive compensation purportedly justified by the tens of millions of dollars in earnings being falsely reported that precipitated both of these multi-million dollar earnings restatements – which, along with the tens of millions of dollars in professional fees Insight has spent restating its financial results twice now, defending two SEC investigations and defending multiple shareholder actions – the Insight Board has made no effort to recover.

2.     Regardless of the ultimate outcome of these newest securities fraud class action lawsuits brought in connection with Insight's 2009 Illusory Profiteering restatement, Insight is once again exposed to hundreds of millions of dollars in potential liability and costs associated with investigating and defending these lawsuits and the related SEC investigation.  Moreover, taking advantage of the inflation in Insight's stock price caused by their misconduct, certain Individual Defendants cashed-in, selling more that $34 million in Insight shares they obtained for pennies on the dollar by exercising stock options they caused Insight to grant them – often improperly backdated stock options that Insight's Board and senior executives failed to rescind following the Company's 2006 admission that these options had been improperly backdated.  In fact, between 1996 and the present date, the Crown Brothers alone sold hundreds of thousands of shares of Insight stock – reducing their combined ownership of the Company's equity from over 36% to less than 1% – and reaping  tens of millions of dollars to the detriment of Insight and its shareholder owners.

## SUMMARY OF THE ACTION

3.     Insight, headquartered in Tempe, Arizona, specializes in the direct marketing of brand-name microcomputers, peripherals, and software through catalog, phone, and Internet sales to large enterprises, small- to medium-sized businesses and public sector institutions in North America and around the globe.  Insight also offers services to manufacturers who outsource their marketing, sales, or distribution activities.

4.     Insight was founded in 1988 by brothers Eric J. Crown ("Eric Crown") and Timothy A. Crown ("Tim Crown") as a reseller of hard drives.  The Company was incorporated in Delaware in 1991.  Launched at the time of rapid expansion and growth of the technology industry, Insight grew quickly, expanding operations with telesales centers and e-commerce

capabilities.   Insight.com was one of the first websites to sell technology products over the Internet.

5.     Eric Crown was working as a retail computer sales person when he and his brother Tim Crown founded Hard Drives International in 1986, as a mail order company that sold computer hard drives and other mass storage computer products through direct marketing.  For the first several years of the predecessor company's existence, Eric Crown, his brother, Tim Crown, and a third employee, purchased computer parts at the lowest prices possible, assembled the parts in a small apartment and resold the resulting computer hard drives at a minimal markup.

6.     They borrowed $2,000 on a credit card, rented 100 square feet of office space, and bought an ad in *Computer Shopper* magazine selling hard drives.  Their advertised prices were less than the Crown Brothers could buy the hard drives for, but they calculated that their prices would drop between the time of buying the ad and the date it was published.  Hard drive prices fell, and their gamble paid off, making Hard Drives International famous for having the lowest prices on hard drives

7.     To build market share, between 1986 and the mid 2000s, the Crown Brothers modeled the Company's business strategy on achieving high sales volumes and taking only paper-thin profit margins.  To prosper as a direct marketer, the Crowns had to overcome the notoriously small profit margins in the computer catalog industry and the fierce competition from other catalogs, discount retailers, superstores, and resellers.  Each of their direct marketing efforts would require a high response level and significant sales.  Any blunder or business slow-down could vaporize the paper-thin profit margins being realized.

8.     In 1988, Hard Drives International evolved into Insight Direct.  Insight Direct marketed mass storage products through ads in computer magazines and inbound toll-free telephone lines.  In 1991, the Company added several product lines, including name-brand personal computers, software, and peripherals.  By 1992, Insight was spending $1.5 million each month on ads in print media.  In 1993, the Company added catalogs to market more than 20,000 computer-related products, including hard drives, CD-ROM drives, and software.

9.      By the early 1990s, the Company also began using outbound telephone account executives who focused on larger, corporate customers.  Typically, two out of every three sales were going to existing customers.  Account executives were instructed to cultivate strong relationships with their clients so that Insight would become the primary source for these customers' computer-related purchases.  Eric Crown termed the overriding principle of the sales force "solution selling."  As investigative reporter Diane Cyr of *Direct* would explain in 1995,

> The sales model here is all Crown ... if you're good you get rich, and if you're not you get out. Miss your goal by one cent, no bonus. Exceed your goal, and you might go on a Caribbean cruise, take a trip to New Orleans, or personally get handed 500 bucks by Eric Crown himself.  The more you sell, the bigger the rewards, the bonuses, the commission percentage. Reps are even empowered to offer volume discounts, cut deals, do whatever it takes to get the customer.

The result was an 8 percent call response rate to catalogs in 1995, with one-third converted to sales.

10.     Insight's 800-number system contributed to establishing strong relationships between its 300 account representatives and customers.  The Company maintained more than 1,000 toll-free telephone numbers linked with specific catalogs and promotions.  Each catalog or promotion was assigned an individual 800 number, which connected to specific account executives. As a result, account representatives were linked by their areas of expertise – whether small business, geographic area, or otherwise – to a given catalog or promotion.  This system made targeting and tracking customers easy.  Account executives also had individual toll-free telephone numbers, so they could be contacted repeatedly, giving customers the opportunity to speak with an individual who was familiar with them instead of whichever representative happened to answer the phone.

11.     In 1993, Insight also began offering outsourcing services to leading manufacturers such as Toshiba, AST, Samsung, Conner Peripherals, and Motorola.  Essentially, Insight assumed marketing, sales, accounting, and/or distribution functions for these manufacturers.  Insight created catalogs or processed orders from those catalogs for these major industry players.  By 1995, 12.2 percent of Insight's sales came from its outsourcing services.

12.     By 1995 Insight reduced its monthly spending on print ads to $150,000.  The Company introduced its home page on the World Wide Web and issued the first ever Real Audio Talking Advertisement on the Internet.  ***Insight's Internet marketing efforts drew thousands of hits and elicited about 500 catalog requests every day – amounting to tremendous transaction volumes, including many returns and refund requests.***

13.     In preparation for Insight's planned initial public stock offering in 1995, the Insight Board's Executive and Audit Committees established policies and protocols requiring periodic account reconciliations to address the growing number of customer returns and refunds and funds owed supliers.  This was particularly important due to the high-volume transactions in which Insight engaged and the fact that the Company's customers were often dealing with different product-specific sales representatives.  Rather than issuing a separate refund every time a product or service was returned or rejected, Insight promised to simply credit customers' Net 30 accounts so that the funds could be applied toward future purchases.

14.     In 1995, the Board Audit Committee met with KPMG LLP ("KPMG"), which had served as Insight's outside auditor since its inception in 1988, to obtain consulting and auditing services, including so-called "Unclaimed property services," that the Board authorized KPMG to provide in order to assist Insight's executives and employees in processing, accounting for, and reporting funds belonging to Insight's customers and suppliers which were supposed to be held on Insight's books as liabilities in the form of "trade credits" until the funds were applied to future sales, ***or returned to the customer or supplier***, whichever the case may be.  Again, because of Insight's high volume practices and the need to apply customer refunds to later purchases and unpaid supplier invoices to later purchases, ***or refund said sums if there were no further purchases made by the customers or services/goods tendered by the suppliers***, these account sweeps and reconciliations were very important and involved millions of dollars in funds that did not belong to Insight.  Accordingly, the Board, its Executive and Audit Committees adopted Policies to address when and how these "trade credits" were to be treated.  This was especially important as Eric Crown had a self-professed "*carpe diem* style of management," leading him to

6

1   explain in 2008, "[w]e used to have a phrase: Ready, fire, aim.  We don't have time to try these

2   things until the end of time.  ***We're not a bunch of accountants!*** Get it going!"

3   15.   In 1995, Insight became a publicly traded company on Nasdaq.  It offered 1.5

4   million shares of common stock at $9.00 per share and closed at $10.37 on the first day of trading.

5   Insight accrued $245 million in sales that year, plus $6.1 million in operating earnings.

6   Employees numbered more than 500, and the Company's catalog house file held 1 million names.

7   16.   Yet, being publicly-traded put more pressure than ever on the Crowns to "meet their

8   numbers."  This rapid evolution was not achieved without taking significant shortcuts.  The

9   Crown Brothers won a reputation for low prices, but that alone wasn't enough to survive the

10  cutthroat years of the late '80s and '90s.  Insight also relied on top-notch logistics and savvy sales

11  and marketing – a model similar to big technology – which enabled retailers like Amazon and

12  Wal-Mart to thrive.  Over that period, the Company changed rapidly to keep up with technology

13  and sales trends, always retaining a high-volume/low-margin model.

14  17.   As Eric Crown would later explain, as they grew the Company between 1986 and

15  the mid 2000s: "Typically we'd sell at 10 percent over our cost that we purchased [goods] for and

16  we'd try to make 5 percent to the bottom line," underscoring that to make a profit, "You have to

17  move quickly from millions [of dollars] to billions."  However, as *Repertoire Magazine* explained

18  in December 2006, "[i]n years past, says Charles Layne, vice president of SMB (small- and

19  medium-sized business) sales, Insight and its competitors could differentiate themselves on the

20  basis of price, or the ability to quickly deliver products or track down obscure ones.  'But

21  everyone now has the ability to do that,' says Layne, largely due to online resources."  As Tim

22  Crown would explain in 2008, "customers now have a great degree of power in the industry and

23  the average margin on sales is ***a measly six percent***," stating it requires a "tremendous volume" to

24  make a profit at that margin.  Tim Crown also explained in 2008 that as computer prices fell year

25  after year, companies working off margins, such as Insight, relying on high volume and low

26  margin sales, had to grow by about the same percent just to maintain consistent sales each year.

27  [Emphasis added.]

28

7

18.     In order to increase sales volumes over the years, the Crown Brothers dramatically increased Insight's sales force.  However, to decrease the resulting costs in order to increase Insight's reported profits, increasing the Company's stock price and justifying higher cash bonuses for them, the Crowns caused Insight to violate the Fair Labor Standards Act between 2002 and 2004 by not paying salaried employees for 40-hour work weeks, by withholding overtime pay and making other unlawful payroll deductions.  As a result, in June 2005, Insight was forced to pay $1.3 million in back wages to more than 2,000 employees in response to an enforcement action by the U.S. Department of Labor.  McGinnis, Insight's Senior Vice President of Finance, blamed the violations on "bad advice" the Company's executives received from outside counsel.  The 2,000+ employees eligible for back pay constituted approximately one-half of the Company's worldwide work force, most of whom worked at the Company's Tempe headquarters.

19.     Meanwhile, in another attempt to partially offset the Company's growing compensation expenses, the Crowns attempted to cash-in on the phenomenal market price increases in the Company's stock price.  During the roaring IPO internet boom of the late 1990s, the Company's stock price traded at over $40 per share.  In order to monetize the increased market capitalization, between 1995 and 2005, Insight's senior executives granted – and the Insight Board and its Compensation Committee approved the granting of – "more than 28,000 individual option grants, involving options on more than 28 million (split-adjusted) shares, on 957 separate grant dates" to themselves and other Insight executives and employees to acquire Insight stock.  The Compensation Committee itself valued the options granted to the Insight executives named in this action alone between 1995 and 2005 at over $105 million.  Of these, the Crown Brothers received options on over 7.6 million shares.

20.     As the Individual Defendants would later concede in connection with the Company's 2007 restatement (precipitated by the announcement in the fall of 2006 that the SEC was investigating Insight's historical stock option granting practices), many of these options were intentionally "backdated."  Backdating improperly and covertly increases the value of the option grants because the Company's stock was trading at a lower price on the earlier date later selected

to record the grant, rendering the exercise price (or "strike price") lower and the option's conversion value higher.  Because of the improper backdating of these options, the Company would later be forced to admit in connection with its July 2007 earnings restatement that "corrections to [Insight's] consolidated financial statements [for fiscal 1995- 2005] were required to reflect additional material charges for stock-based compensation expenses and related income tax effects," significantly reducing the Company's previously-reported earnings by over $30 million!  The Company would also disclose it was forced to expend more than $15 million on professional fees restating almost every financial report Insight had issued as a publicly-traded company and defending an SEC investigation.  In connection with the 2007 Backdating restatement, the Insight Board was also forced to admit the Company had been operating with inadequate internal controls throughout the Backdating Period, resulting in the massive accounting misstatement and tens of millions of dollars in improper executive compensation being paid in the form of backdated stock options.

21.    However, rather than seek rescission of the backdated stock options and the improper profits obtained by Insight's senior executives on these option grants, in fall of 2006, the Insight Board created an Options Subcommittee which approved moving to dismiss a shareholder derivative action filed in the fall of 2006, though the action sought recovery on behalf of Insight, calling the plaintiff's allegations too "speculative" to be credited.  Despite later conceding, after the 2006 shareholder action was voluntarily dismissed, that the stock options had in fact been intentionally backdated, the Insight Board has never sought recovery or damages – recessionary or otherwise – from the Company's defalcating fiduciaries.

22.    Instead, in 2008 Tim Crown would explain that "as the company was growing by leaps and bounds, he and his brother postponed their own financial gratification….." Referring to his brother, Tim Crown explained that "[f]rom a management perspective, Eric has the ability to think things through so clearly so far in advance.  He can think five or seven steps ahead … so what becomes obvious to you in two years is obvious to him today." Explaining his own May 2007 decision to resign his Board seat (in the midst of the 2007 Backdating investigation and

restatement), and his conclusions as to viability of Insight's business model at the time of his resignation, Eric Crown added:

> "Back then you were fighting dynamics beyond just the product; you were fighting acceptance of mail order, you were fighting the acceptance of the Internet," says Crown.  "It's a tough business and [that's why I retired from it] *because I knew it didn't have a 'forever' future -- or not a future I chose to be in….*"

> "Bottom Line:

> - Dynamic industries require decisive leadership *as there is often very little time to study a decision before having to act on it*.

> - The computer supply business -- be it hardware, software or services -- has matured greatly since its inception two decades ago.  *Growth in computer sales has slowed from more than 50 percent annually to less than five percent.*

> - A low-margin company that can compete on price is tenable *when it is supported by outstanding logistics* and marketing.

> - With continuously falling prices in the very competitive computer industry, *suppliers must make up in volume what they lose in a decreasing sticker price.*

> - *Entrepreneurial leaders must recognize when their creation becomes mature* and must face a day when the company needs new leadership."

[Emphasis added.]

23.    Yet, the Crown Brothers were not content with leaving Insight empty-handed. Instead, in order to cash-in on the Company's good fortune they felt they had sacrificed to create – at the expense of the Company and its public shareholder owners - beginning at least as early as 1996, and continuing through February 9, 2009, the Crown Brothers, aided and abetted by former CFO Laybourne and the rest of the Insight Board who serve at the founders' behest, devised, approved and executed yet another plan to increase their own executive pay and the value of the stock options the Crowns and Laybourne still held by: (a) causing Insight to improperly withhold over $60 million in refunds and other credits due customers and suppliers, (b) causing Insight to retain these refunds in a "slush fund" and thereafter move them to income in the Company's

publicly-reported financial results (thereby materially overstating earnings) when needed to keep Insight's *reported* earnings results rising consistently; (c) causing Insight to file false and misleading financial statements with the SEC that were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), despite claiming otherwise; (d) causing Insight to file false and misleading certifications required by the Sarbanes-Oxley Act of 2002 with the SEC attesting that Insight had adequate internal and financial controls, when it did not; (e) permitting the Company to continue operating with material weaknesses in its financial reporting and executive compensation internal controls in order to facilitate the earnings overstatements and to grant themselves and their cronies excessive compensation based on those results; and (f) to unlawfully mislead investors as to the accuracy of Insight's financial statements in order to artificially inflate the price of Insight's publicly-traded securities during the Illusory Profiteering Period, enabling certain company insiders to sell over 2,287,309 million shares of their own personally-held Insight shares for over $49 million in proceeds.

24.     As a result, in its 2008 annul report to shareholders on Form 10-K (filed with the SEC in May 2009), Insight was once again forced to admit that because it had withheld more than $60 million in funds due customers and suppliers in the form of "trade credits," it had been falsifying its financial results, improperly reporting these trade credits as the Company's own profits since 1996.  The Company was forced to announce that it was recording a material reduction to previously reported retained earnings dating back to December 31, 2003 of between $50 to $70 million, but that it had not yet notified any of the customers or suppliers whose funds had been improperly withheld and converted to illusory profits in Insight's publicly-reported financial reports, and so the actual total cash refund due (estimated at $61 million) was still unknown.  Explaining the 2009 Illusory Profiteering restatement in May 2009, the Company's new Chief Financial Officer, Glynis A. Bryan ("Bryan"), who had joined Insight in late 2007, expressly conceded that Insight's senior executives had shown "poor judgment" in treating as "abandoned" and moving the withheld customer and supplier funds to Income pursuant to the Policy devised by the Board and its auditors in 1995 and that prior to her arrival in late 2007,

1  Insight had not even been adhering to the Policy requiring the customer and supplier funds be
2  retained on the Company's books for 180 days before being moved into Income.

3        25.     Bryan also disclosed that she had discovered the impropriety of the Policy which
4  precipitated $60 million in accounting misstatements in connection with closing each of Insight's
5  three quarterly financial statements during 2008.  Throughout 2008, Bryan would meet repeatedly
6  with the Board's outside auditors and its Audit Committee to determine how long this improper
7  accounting treatment had gone on and how much money was involved.  Ultimately, the Audit
8  Committee was forced to commence an internal review in 2008.  Yet, the trade credit earnings
9  overstatement was not reported to the Company's regulators and investors, much less the affected
10  customers and suppliers, until February 2009 when the Audit Committee's internal review was
11  completed and a decision to restate was publicly-disclosed.  When the news of the Individual
12  Defendants' misconduct and false statements to the investing public reached the market on
13  February 9, 2009, along with a downward earnings guidance, Insight's stock price crashed,
14  erasing nearly half of its market capitalization in a single day.

15        26.     Insight also immediately terminated Charles Layne ("Layne"), Insight's Senior Vice
16  President of Sales who had been primarily charged with overseeing sales to small and medium-
17  sized businesses, the customers most likely to have had refunds improperly withheld and then
18  improperly reported as Insight profits.  Mark T. McGrath ("McGrath"), President of Insight Direct
19  USA and Karen K. McGinnis ("McGinnis"), Vice President of Finance (and who worked for
20  KPMG until 2005) were also let go.  While the details concerning Layne's and McGinnis'
21  severance packages remain concealed, just weeks before the trade credit restatement was
22  announced, *while the Audit Committee's internal investigation was still ongoing,* the Insight
23  Compensation Committee secretly granted McGrath and others new compensation agreements.
24  McGrath's provided for an astounding $1.4+ million severance payment upon his termination.
25  Indeed, the Company's 1Q 09 10Q filed with the SEC in May 2009 states the Company expended
26  $6.3 million in severance related expenses in connection with terminations following on the heels
27  of the Illusory Profiteering restatement.

28

27.   The Company also reported that as of the end of the 1Q 2009, it has already been forced to expend $4.1 million in professional fees in connection with the investigation, restatement and defense of a new SEC investigation resulting from the 2009 Illusory Profiteering restatement, and that its related expenses continue to mount.

28.   As the direct, proximate and foreseeable result of the Individual Defendants' illegal misconduct, as set forth herein, Nasdaq threatened to delist Insight's common stock for failing to comply with Nasdaq Marketplace Rule 4310(c)(14) (which requires the timely filing of all reports and other documents filed or required to be filed with the SEC), and the Company was forced to seek waivers from its revolving credit facility, its accounts receivable securitization financing facility and its inventory financing facility.

29.   As the direct, proximate and foreseeable result of the Individual Defendants' fraudulent course of conduct, as set forth herein, since March 24, 2009, the Company has been named as a defendant in at least three securities fraud class actions filed in federal court alleging that Insight and its senior executives defrauded the purchasers of Insight's common stock dating back to April 2004.   Regardless of the ultimate outcome of these shareholder lawsuits, the Company is again exposed to tens of millions of dollars in potential liability and costs associated with investigating and defending these lawsuits.

30.   And as a direct and proximate result of the Individual Defendants' misconduct, Insight's once valuable enterprise value and reputation has again been irreparably tarnished and its costs of capital have been increased due to reductions in its market capitalization and being forced to obtain waivers from its lenders in order to avoid default.

31.   The Individual Defendants each owed and failed to carry out their fiduciary obligations to the Company and its shareholders.   As such, this shareholder derivative action on behalf of Insight seeks to recover damages caused to the Company by its directors, CEO and senior officers who breached their fiduciary obligations to the Company.   Because of the gross dereliction of duty alleged and the fact that a majority of the members of Insight's Board of Directors were potentially liable for the misconduct alleged and/or irremediably conflicted from disinterestedly and impartially considering a presuit demand at the time this action was filed on

June 15, 2009, and by virtue of their longstanding personal, professional and financial relationships with the Crown Brothers, demand on the Insight Board would be futile and was not made.

**JURISDICTION**

32.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

33.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein occurred in this District and one or more of the defendants either resides or maintains executive offices in this District.

**THE PARTIES**

*Plaintiff*

34.     Plaintiff Robert P. Baca is and was a shareholder of nominal defendant Insight at relevant times.  Plaintiff Baca is a resident and citizen of New Mexico.

*The Nominal Defendant*

35.     Nominal Defendant Insight Enterprises, Inc. provides brand-name information technology hardware, software, and services to small, medium, and large businesses; and public sector institutions in North America, Europe, the Middle East, Africa, and the Asia-Pacific.  A Delaware corporation, Insight was founded in 1988 and is headquartered in Tempe, Arizona.  The Company has more than 4,000 employees worldwide and is ranked number 484 on Fortune magazine's 2009 Fortune 500 list.

*The Individual Defendants*

36.     Defendant Tim Crown has been a director of Insight since 1994 and non-executive Chairman of its Board since November 2004.  A co-founder of the Company, Tim Crown stepped down from the position of President and Chief Executive Officer ("CEO") in November 2007, positions he had held since January 2000 and October 2003, respectively.  Tim Crown is the brother of defendant Eric J. Crown and a citizen of Arizona.

14

37.     Defendant Eric Crown is a co-founder of the Company, was Chairman of the Board of Insight through November 2004 and a director through November 2007.  Eric Crown has held various officer and director positions with Insight and its predecessor corporations since 1988, including CEO until 2001.  Eric Crown is the brother of defendant Tim Crown and a citizen of Arizona.

38.     Defendant Richard A. Fennessy ("Fennessy") has been President and CEO of the Company since November 2004 and a director since September 2005.  Fennessy is a citizen of Arizona.

39.     Defendant Glynis A. Bryan ("Bryan") joined Insight in December 2007 as Chief Financial Officer ("CFO").  Bryan is a citizen of Arizona.

40.     Defendant Karen K. McGinnis ("McGinnis") joined Insight in March 2000 as Vice President of Finance.  McGinnis became Senior Vice President of Finance in April 2001 and was named Chief Accounting Officer in September 2006.  McGinnis was Assistant Secretary of the Company beginning in January 2005.  Prior to joining Insight, McGinnis was a Senior Assurance Manager with KPMG, which had served as Insight's "independent" auditor since 1988. McGinnis' employment with Insight was terminated effective March 31, 2009.  McGinnis is a citizen of Arizona.

41.     Defendant Stanley Laybourne ("Laybourne") was a director of Insight from 1994 to May 2007.  Laybourne also served as CFO, Treasurer and Secretary of the Company until his employment was terminated in May 2007.  Laybourne is a citizen of Arizona.

42.     Defendant Mark T. McGrath ("McGrath") served as President of Insight Direct USA from 2005 until his termination on March 1, 2009.  McGrath is a citizen of Arizona.

43.     Defendant Charles Layne ("Layne") served as Insight's Senior Vice President of Sales until his termination announced February 23, 2009.  Layne had been with Insight for ten years and had held multiple executive positions within sales and program management.  Layne rejoined Insight Direct as Senior Vice President of Insight SMB in August of 2005.  Prior to taking this post, Layne was responsible for running the sales organization of Direct Alliance, a

wholly owned subsidiary of Insight and a global process outsourcing provider for top IT and consumer electronic companies.  Layne is a citizen of Arizona.

44.     Defendant Larry A. Gunning ("Gunning") has been a director of Insight since 1995.  Gunning is a citizen of Arizona.

45.     Defendant Robertson C. Jones ("Jones") has been a director of Insight since 1995.  Jones is a citizen of California.

46.     Defendant Michael M. Fisher ("Fisher") has been a director of Insight since 2001.  Fisher is a citizen of Arizona.

47.     Defendant Bennett Dorrance ("Dorrance") has been a director of Insight since 2004.  Dorrance is a citizen of Arizona.

48.     Defendant Kathleen S. Pushor ("Pushor") has been a director of Insight since September 2005.  Pushor is a citizen of Arizona.

49.     Defendant David J. Robino ("Robino") has been a director of Insight since May 2007.  Robino is a citizen of California.

50.     Defendant Anthony A. Ibargüen ("Ibargüen") has been a director of Insight since July 2008.  Ibargüen is a citizen of Florida.

51.     The defendants Parties in ¶¶37, 39, 45-51 comprised the entire Insight Board as of the filing of this action on June 15, 2009, and are referred to herein as "Director Defendants."  The Parties identified in ¶¶37-39, 41-42, 45-46 are referred to herein as the "Insider Selling Defendants."   Collectively, the Parties referred to herein at ¶¶37-51 are referred to as the "Individual Defendants."

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

52.     By reason of their positions as officers, directors and/or fiduciaries of Insight and because of their ability to control the business and corporate affairs of Insight, the Individual Defendants owed Insight and its shareholders fiduciary obligations of care, candor, compliance, fidelity, trust, loyalty, obedience and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner, and were required

16

to act in furtherance of the best interests of Insight and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

53.     Each director and officer of the Company owes to Insight the fiduciary duty to comply with the laws of the United States and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

54.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations.  Defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board elections and to not advance their own personal, financial or economic interests over and at the expense of the Company's public shareholders.

55.     The Individual Defendants, because of their positions of control and authority as directors or officers of Insight, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Insight, each of the Individual Defendants had access to non-public information about the financial condition, operations and future business prospects of Insight, including, without limitation, the illegal and improper activities which the Individual Defendants caused Insight to engage in.

56.     To discharge their duties, the officers and directors of Insight were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of the Company.  By virtue of such duties, the officers and directors of Insight were required, among other things, to:

          a.     manage, conduct, supervise and direct the business and internal affairs of Insight in accordance with the laws and regulations of Arizona, Delaware, the United States, and pursuant to the charter and bylaws of Insight;

17

b.      neither violate nor knowingly permit any officer, director or employee of Insight to violate applicable laws, rules and regulations;

c.      remain informed as to the status of Insight's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

d.      establish and maintain systematic and accurate records and reports of the business and internal affairs of Insight and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.      maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Insight's operations would comply with all laws, Insight's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to Insight shareholders in Annual Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

f.      exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Insight by the officers and employees of Insight and any other reports or other information required by law from Insight and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

57.      During all times relevant hereto, each of the Individual Defendants occupied positions with Insight or was associated with the Company in such a manner as to make him or her privy to confidential and proprietary information concerning Insight, its operations, finances and financial condition.  Because of these positions and such access, each of the Individual Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from Insight's shareholders and the public at large.  The Individual Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to disclose material

information regarding Insight and to take any and all actions necessary to ensure that the officers and directors of Insight do not abuse their privileged positions of trust, loyalty and fidelity in a manner which causes the Company to violate the law.

**THE CROWN BROTHERS' TEN YEAR - $30+ MILLION - OPTION BACKDATING SCHEME AND THE BOARD'S ABANDONMENT OF OVER $45 MILLION IN POTENTIAL RECOVERY TO INSIGHT**

58.     Between at least January 1995 – the first year Insight reported as a publicly-traded company – and November 2005 – including almost three years following the passage of the Sarbanes Oxley Act of 2002 which expressly required the accurate disclosure of Insight's compensation practices and the implementation of meaningful internal controls – the Crown Brothers, assisted by Laybourne and Insight's other senior management, and facilitated and approved by its Board of Directors and Compensation Committee, backdated the options for millions of shares of common stock they caused Insight to grant them as part of their lucrative compensation packages.  Backdating these stock options between 1995 and 2005 (the "Backdating Period") permitted the Crown Brothers, Laybourne and other executives to obtain tens of millions of dollars beyond the compensation paid that Insight reported to its regulators, the market and its shareholders.  It also caused Insight to overstate its earnings and underreport and under pay its tax liabilities by at least $30 million between 1995 and 2005.

59.     Specifically, during the Backdating Period, the Crown Brothers and the Board's Compensation Committee valued the tens of millions of stock options they caused Insight to grant them at *over $105 million*:

| Year/ Defendant | Number of Shares Underlying Option Grants | Potential Realizable Value Assigned by Insight's Executives |
|---|---|---|
| **1996** Laybourne | 50,000 | $1+ million |
| **1997** Eric Crown | 67,499 | $780,000 |
| Tim Crown | 67,499 | $780,000 |
| Laybourne | 22,499 | $700,000 |
| **1998** Eric Crown | 168,750 | $4.8 million |

19

| | | |
|---|---|---|
| Tim Crown | 168,750 | $4.8 million |
| Laybourne | 90,000 | $2.5 million |
| **1999** | | |
| Eric Crown | 120,000 | $5.5 million |
| Tim Crown | 120,000 | $5.5 million |
| Laybourne | 100,000 | $4.3 million |
| **2000** | | |
| Eric Crown | 2,945,000 | $13.8 million |
| Tim Crown | 2,945,000 | $13.8 million |
| Laybourne | 1,412,500 | $4.7 million |
| **2001** | | |
| Eric Crown | 250,000 | $6.5 million |
| Tim Crown | 250,000 | $6.5 million |
| Laybourne | 250,000 | $4.7 million |
| **2002** | | |
| Eric Crown | 84,000 | $1.4 million |
| Tim Crown | 250,000 | $4.1 million |
| Laybourne | 74,250 | $1 million |
| **2003** | | |
| Laybourne | 25,000 | $232,000 |
| **2004** | | |
| Fennessy | 500,000 | $6 million |
| Tim Crown | 186,000 | $2.2 million |
| Laybourne | 93,000 | $1.2 million |
| **2005** | | |
| Fennessy | 350,000 | $4.2 million |
| Laybourne | 80,000 | $900,000 |
| McGrath | 200,000 | $2.4 million |

60.     As a result of their purported "discovery" of the backdating, in October 2006 the Company announced it would not be able to timely file its quarterly financial report on Form 10Q, that it had been forced to appoint an "Options Subcommittee" (comprised of defendants Dorrance and Pushor) to review its historical stock option grant policies and that the Company had received an inquiry from the SEC concerning its stock option grant practices between January 1, 1996 and October, 2006.

61.     Meanwhile, a shareholder derivative action entitled *Bernard Apotheker v. Crown, et al.*, was filed on September 20, 2006 in the Superior Court of Maricopa County, Arizona, Case

No. 2006-012279.  The action charged the Crown Brothers and Laybourne with having received tens of millions of dollars in backdated stock options and charged the Crowns, Laybourne and the rest of the Insight Board (including Gunning, Jones and Fisher) with causing or permitting Insight to falsify its publicly-reported financial results.[1]  In December 2006, Insight, at the direction of ifs Board of Directors which then consisted of Defendants Eric Crown, Tim Crown, Laybourne, Gunning, Jones, Fisher, Fennessy, Dorrance and Pushor, moved to dismiss the Maricopa County shareholder derivative action claiming the backdating allegations were too "speculative," specifically stating that an Options Subcommittee had been formed to investigate the claims (consisting of Defendants Dorrance and Pushor), and that its investigation was not yet complete. The motion to dismiss these Defendants caused Insight to file expressly argued the "Court should defer to Delaware's strong policy allowing corporations to manage their own affairs and allow Insight to complete the internal investigation into its stock options practices that is now underway."  The motion to dismiss these Defendants caused the Company to file also sought attorneys fees from the shareholder plaintiff in connection with filing the motion to dismiss, reiterating that its "speculative claims….must be dismissed."  The shareholder-plaintiff immediately dismissed that action.

62.    However, in order to resolve the SEC investigation and inquiry, by July 2007 Insight would be forced to concede its executives had indeed intentionally backdated millions of stock option grants and that it would be forced to restate earnings back to January 1, 1995 – the beginning of its history as a publicly-traded Company – through and including grants made as late as November 30, 2005 – nearly three years after the Sarbanes Oxley Act of 2002 went into effect. As explained in Insight's annual financial report for the fiscal year ended December 31, 2006, filed in late July 2007, the option backdating scheme did not involve isolated events and/or errors – but instead evidenced a ten-year scheme involving tens of thousands of individual grants

---

[1]     Purportedly Defendants Fennessy, Pushor and Dorrance were not named as defendants in that action because, though they were on the Board when the lawsuit was filed, they were not on the Board when many of the options were granted.

resulting in the issuance of tens of millions of shares of Insight's common stock – *which would require the restatement of over $30 million in previously-reported earnings*:

> *During this period, the Company made more than 28,000 individual option grants, involving options on more than 28 million (split-adjusted) shares, on 957 separate grant dates*.  Additionally, the Company undertook an analysis of the results of the Options Subcommittee's review as well as all stock option activity during the Relevant Period.  We determined that corrections to our consolidated financial statements were required to reflect additional material charges for stock-based compensation expenses and related income tax effects.

> *Our consolidated retained earnings as of December 31, 2005 incorporates an aggregate of approximately $30.9 million in incremental stock option-related compensation charges relating to the period from January 24, 1995 through December 31, 2005.*  This charge is net of a $16.5 million tax benefit related to the restatement adjustments.  This additional compensation expense results from our determination, based upon the Options Subcommittee's review and the Company's analysis, that for accounting purposes, the dates initially used to measure compensation expense for many stock option grants to employees, executive officers and outside non-employee directors during the period could not be relied upon.

[Emphasis added.]

The 2006 annual report also made clear that the massive option backdating scheme involved knowing, intentional misconduct, rather than simple arithmetic errors, and that the Compensation Committee's documentation and processes were defective:

> *In particular, the Options Subcommittee identified various categories of grants that had been made by the Company during the period under review including: (a) discretionary grants of various types; (b) anniversary grants; (c) promotion grants; (d) new hire grants; and (e) program grants.*  In general, the Options Subcommittee found: (x) a lack of significant issues with respect to new hire grants; (y) *that during a portion of the period under review, the Company retrospectively selected dates for anniversary grants and promotion grants based on the lowest price in a particular period*; and (z) *inadequate documentation surrounding certain discretionary grants, including grants to officers that required approval by the Compensation Committee.  We determined that the revised measurement dates for accounting purposes differed from the originally selected measurement dates due primarily to: (i) insufficient or incomplete approvals; (ii) inadequate or incomplete establishment of the terms of the grants,*

22

*including the list of individual recipients; and (iii) the use of hindsight to select exercise prices.*

[Emphasis added.]

63.     Adding insult to injury, the 2006 annual financial report disclosed that Insight – and by definition its shareholder owners – had "incurred approximately $11.8 million in costs for legal fees, external audit firm fees and external consulting fees through June 30, 2007 and anticipate[d] approximately $3 million in additional fees [would] be incurred through August 2007 in the completion of financial statement restatement and related matters" – resulting in total costs of nearly $15 million.

64.     The 2006 annual financial report also expressly disclosed that Insight's internal controls in the areas of accounting and executive compensation were woefully defective and specifically promised these "material weaknesses" were being remedied:

> Management has determined that we have a material weakness in our internal control over financial reporting relating to the implementation and administration of our equity compensation programs and the accounting for awards thereunder as of December 31, 2006. As described in more detail in Item 9A of this Annual Report, although the Company made its last stock option grant on November 30, 2005, based on the findings of the Options Subcommittee, the problems uncovered during the review have caused the Company to undertake remedial measures to ensure that similar problems cannot occur in connection with its grants of restricted stock. *We have identified and are implementing measures designed to remedy this material weakness.*

[Emphasis added.]

65.     Indeed, the Insight Audit and Compensation Committee charged with overseeing Insight's audit and compensation practices during the Backdating Period – and the Audit and Compensation Committee members who oversaw the $30 million earnings restatement due to the backdating scandal – comprise many of the Defendants who still serve on Insight's Board:

| Year | Compensation Committee Members | Audit Committee Members |
|------|-------------------------------|-------------------------|
| 1996 | Gunning, Jones | Gunning, Jones |
| 1997 | Gunning, Jones | Gunning, Jones |
| 1998 | Gunning, Jones | Gunning, Jones |

| 1999 | Gunning, Jones | Gunning, Jones |
|------|----------------|----------------|
| 2000 | Gunning, Jones | Gunning, Jones |
| 2001 | Gunning (Chair), Jones, Fisher | Gunning, Jones, Fisher (Chair) |
| 2002 | Gunning (Chair), Jones, Fisher | Gunning, Jones, Fisher (Chair) |
| 2003 | Gunning (Chair), Jones, Fisher | Gunning, Jones, Fisher (Chair) |
| 2004 | Gunning (Chair), Jones, Fisher, Dorrance | Gunning, Jones, Fisher (Chair) |
| 2005 | Gunning (Chair), Jones, Fisher, Dorrance, | Jones, Fisher (Chair), Pushor, |
| 2006 | Gunning (Chair), Jones, Fisher, Dorrance | Jones, Fisher (Chair), Pushor |

66.     Moreover, despite having sought dismissal of the shareholder litigation claiming the backdating claims were just too "speculative," neither the Insight Board (then consisting of Defendants Eric Crown, Tim Crown, Laybourne, Gunning, Jones, Fisher, Dorrance, and Pushor) nor its Options Subcommittee (Defendants Dorrance and Pushor) has ever sought recovery from the Crown Brothers, Laybourne, or any of the many other Insight executives and employees who received the backdated stock options, for either the $30+ million in excessive compensation they received or the $15+ million Insight expended in professional fees investigating the backdating, restating and defending the SEC investigation.

67.     This ten-year backdating scandal, which erased $30 million in earnings Insight had previously reported and cost the Company – and by definition its shareholder owners – nearly $15 million in professional fees to restate previously reported financial results, affirmatively placed the entire Insight Board of Directors on notice that the Crown Brothers were both capable of and willing to "cook the books" to enhance their own executive compensation.  This knowledge required each member of the Insight Board of Directors (which at the time of the Backdating restatement consisted of Defendants Fennessy, Tim Crown, Eric Crown, Gunning, Jones, Fisher, Dorrance, Pushor, and Laybourne), the members of the Board's Audit Committee (which then consisted of Defendants Jones, Fisher (Chair) and Pushor), and the members of the Board's Compensation Committee (which then consisted of Defendants Gunning (Chair), Fisher, Jones

24

and Dorrance) to study, design and implement enhanced accounting and executive compensation policies and protocols to ensure that the Company's internal controls over its accounting and executive compensation functions were brought into compliance with the federal securities laws, Generally Accepted Accounting Principals ("GAAP"), Delaware corporate law and the Nasdaq Exchange Rules – something each of these Defendants failed to do.

68.     Moreover, by intentionally refusing to seek recovery of the $45+ million in excessive executive compensation received and the costs of investigating, restating and defending Insight in the SEC investigation from the beneficiaries of the backdated stock options, or allowing the Company's shareholder owners to do so, the Insight Board (then consisting of Defendants Fennessy, Eric Crown, Tim Crown, Laybourne, Gunning, Jones, Fisher Dorrance and Pushor) committed corporate waste.

### THE CROWN BROTHERS' THIRTEEN YEAR ILLUSORY PROFITS AND EXCESSIVE COMPENSATION SCHEME

69.     A trade credit exists, by definition, when one firm provides goods or services to a customer with an agreement to bill them later, or receive a shipment or service from a supplier under an agreement to pay them later.  When trade credits are "issued," a company immediately records a liability on its books memorializing the obligation and later reduces that liability when the liability ceases to exist under the terms of the parties' agreement.  Beginning in 1995, Insight purportedly created such "trade credits" for its "Net 30" customers in circumstances such as where a customer returned a product after paying for it, where a customer accidentally paid an invoice twice, and/or where suppliers failed to effectively invoice Insight.  In these instances, Insight promised the customers or suppliers that the funds would be credited towards future purchases or sales, respectively, such that customers were promised they would receive additional merchandise without being billed for it in the future and suppliers were promised they would receive payment in full on a later date.  However, Insight's executives, at the direction of its Board which was paying KPMG to treat these funds as "abandoned" or "unclaimed" property, failed to keep these promises.  Instead, as they needed the funds to meet the earnings expectations they had led the investment community to expect, and thus achieve their performance targets,

Insight's executives treated these funds as "abandoned," transferred them to the Company's Income Statement and reported them as illusory profits.

70.      Insight's practice of withholding of customer and supplier funds was widely known of by affected customers and suppliers.  These were largely the Company's smaller business and individual customers and suppliers with less bargaining power and ability to enforce their rights to refunds.  In fact, in May 2009, Bryan would concede that the Board had long before instituted a specific customer account sweeping Policy that prevented customer funds from being improperly withheld from larger corporate customers.  Unfortunately, the Board assisted by KPMG, had devised, and the executives were implementing, a policy of improperly withholding refunds from smaller customers.   As the *Arizona Republic* reported on May 12, 2009, explaining the restatement:

> . . . Chief Financial Officer Glynis Bryan said it could take several years to finish settling with customers affected by how Insight accounted for credits due them.
>
> For example, Insight would issue a credit memo to a customer who returned a purchased product or a customer who overpaid for a purchase.
>
> ***If a customer did not claim the credit within 12 to 18 months, Insight would move the credits from its balance sheet to its income statement, which would reduce the cost of goods sold and increase its stated gross profits on financial statements.***
>
> ***Bryan said Tuesday the accounting problem stemmed from states having different laws on accounting for such credits.***
>
> ***Some states require a business to wait longer than 18 months before including an unclaimed credit in gross profit.  Others require businesses to pay the credit to the state, which holds the money until the customer claims it, Bryan said.***

[Emphasis added.]

71.      One former Insight customer reportedly characterized his experience with Insight's "NET 30 credit" program as "a nightmare."  According to this customer, Insight's handling of the NET 30 trade credits was so deficient,

> We just paid everything with credit card so when we returned items ***they*** would give us our money.

*On a NET 30 [Insight] would sometimes apply the credit to outstanding invoices, most of the time the credit would just sit there.  The real problem is [Insight] never sent you over a credit memo so you could give to you're accounting dept so they knew this money was sitting with Insight in limbo.  If you asked about it [Insight] would say we will apply the credit to other invoice.  You just got tried of trying to keep up with it.*

*Finally we just told [Insight] keep every invoice apart.  When I return something just send me a check.*

*Then we moved to just purchase everything on credit cards.*

[Emphasis added.]

72.     Indeed, the Insight Board, in particular the Board's Audit Committee (which consisted of Defendants Gunning 1996-2008, Jones 1996-2004, Fisher 2001-2008, Pushor 2005-2008, Robino 2005-2008 and Ibargüen since July 2008), authorized the improper accounting treatment of these trade credits, and their proper accounting treatment, as follows:

(a)     First, KPMG had served as Insight's outside auditor since inception in 1988.  Indeed, the Insight account was one of KPMG Phoenix's most lucrative accounts.  KPMG received millions of dollars in fees auditing Insight's financial reports, including $1 million in 2000, $1 million in 2001, $2.26 million in 2002, $886,000 in 2003, $1.8 million in 2004, $1.7 million in 2005, $5.1 million in 2006, $4.5 million in 2007 and $4.3 million in 2008.  The consulting and auditing services the Insight Audit Committee approved expressly included tens of thousands of dollars per year in "Unclaimed property services" fees.  Essentially, each of the fifty states has different laws governing how long Insight had to leave customer and supplier "trade credits" on its Balance Sheet as a liability before it could even consider characterizing the funds as "abandoned" or transferring them to the Income Statement where they would be reported as profits.  Some states did not allow this to occur after just 18 months.  Still, each year, the Insight Audit Committee approved the retention of KPMG and approved its provision of such "Unclaimed property services" to opine that Insight had held the customer and supplier funds long enough before moving them to Income, reporting them as illusory profits.

27

(b)     Second, as the Company's new CFO, Defendant Bryan, would admit in connection with explaining the Audit Committee's internal review that resulted in Insight's earnings restatement in May 2009, the Board had a Policy in place since at least 1996, requiring that bigger customers' accounts be regularly swept to ascertain that refunds were being properly credited. Unfortunately, as Bryan would admit, the Insight Board had approved and implemented the Policy improperly permitting the withholding and movement to Income of refunds due the Company's smaller customers and suppliers.  These smaller customers and suppliers often failed to obtain the refunds due them, and those funds were instead used as a "slush fund" by Insight's executives to meet their earnings expectations.

(c)     Third, as Bryan would also concede in connection with explaining the earnings restatement in May 2009, she was aware throughout 2008 as each quarterly financial statement was being closed that these customer and supplier funds were being improperly moved from liabilities on the Company's Balance Sheet to profits on its Income Sheet.  Board members also reviewed and approved of quarterly financial results, especially Audit Committee members, Fisher (Chair), Ibargüen, Jones and Pushor.  Bryan regularly met with the Board and the Audit Committee to address these concerns she had in connection with the review process throughout 2008, resulting in commencement of the Audit Committee's internal review in 2008.  Bryan also conceded in May 2009 that neither the Company's regulators, or its investors, much less the affected customers and suppliers, had been advised of the improper withholding and false financial reporting until the Company's February 9, 2009 earnings restatement disclosure.

73.     On February 9, 2009, the Company issued a press release entitled, "Insight Enterprises, Inc. Reports Preliminary (Unaudited) Fourth Quarter 2008 Results," which stated in part:

**Restatement of Previously Issued Financial Statements**

Following an internal review, the Company has determined that the Company's historical accounting treatment, since 1996, of certain aged trade credits created in the ordinary course of business was in error.  The error relates primarily to the release of certain aged trade credits from its balance sheet to its statement of earnings prior to the complete release of the underlying liabilities under applicable legal requirements.  Insight is working with its auditors and external advisors to quantify the related liabilities and to establish new policies going forward.  The

28

review, covering trade credits since 1996, is ongoing, but the Company expects that it will restate financial statements which are included in the Company's most recently filed Annual Report on Form 10-K, for the year ended December 31, 2007, and in the Quarterly Reports on Form 10-Q for the first three quarters of fiscal year 2008.  The Company also expects that the restatement of its financial statements will include a material reduction of retained earnings as of December 31, 2004, related to the accumulation of such errors in prior periods.  The cumulative restatement effect is expected to be $50 million to $70 million, before consideration of any tax effects.  Given the high volume of individual transactions involved and complexity of researching each item, the Company expects that the final settlement of these liabilities may take multiple years and may eventually be settled for less than the estimated liability.  Any difference between the restated amounts accrued by the Company and the final settlement with counterparties will be reflected in the periods in which any such resolution occurs.

74.     By February 23, 2009, Insight would report that Defendant McGrath – President of Insight Direct USA, Inc. and one of the Company's most highly paid executives – had been unceremoniously terminated.  Defendant McGinnis, Insight's Chief Accounting Officer – and Layne – Senior Vice President of Sales specifically in charge of small to medium sized business customers, were also terminated.  In order to obtain McGrath's promise to participate in a joint defense effort with the other senior executives, in January 2009, while the Audit Committee was still investigating the trade credit earnings restatement, the Insight Compensation Committee approved an astonishing $1.4 million severance package payable to McGrath.  Layne's and McGinnis' severance packages, if any, remain undisclosed, but the Company later disclosed more than $6 million in severance expenses were incurred.  At this time, the Compensation Committee was comprised of Defendants Fisher (Chair), Jones, Ibargüen, and Pushor.

75.     As a result of the earnings overstatement, on March 19, 2009, the Company reported it had received an informal inquiry from the Division of Enforcement of the SEC requesting certain documents and information relating to the Company's historical accounting treatment of aged trade credits.  This investigation was recently terminated, but Insight is still exposed to potential criminal liability and hundreds of millions of dollars in fines, penalties and judgments if misconduct is later discovered and prosecuted.

76.     On March 4, 2009, the Company also disclosed that Nasdaq was considering taking the punitive action of delisting Insight's common stock due to the Company's failure to file timely financial reports with the SEC.

77.     Beginning in March 2009, three putative class action lawsuits were filed in the U.S. District Court for the District of Arizona against Insight and certain of its current and former directors and officers on behalf of purchasers of Insight securities during the period April 22, 2004 to February 6, 2009 related to the Company's restatement.  Regardless of the outcome of these lawsuits, which expose the Company to hundreds of millions of dollars in potential civil liability to investors, the Company will spend tens of millions of dollars investigating and defending the claims.

78.     On May 12, 2009, during the Company's First Quarter 2009 Earnings Call, defendant Bryan provided more detail as to the Company's improper withholding of customer and supplier payments and illegal recognition of these sums as "aged trade credits," on its Income Statement, including disclosing that:

- Tens of millions of dollars in "errors" existed in the Company's accounting treatment of trade credits dating back to 1996;

- Insight was then taking a one-time charge related to the trade credits in the amount of $61.2 million, forcing it to restate – and thus reduce – previously reported retained earnings by this amount for fiscal years 2003 – 2008, including $21.2 million for fiscal 2003, $4.8 million for fiscal 2004, $9.1 million for fiscal 2005, $9.5 million for fiscal 2006, $10.2 million for fiscal 2007 and $6.3 million for the first three quarters of fiscal 2008.

- Insight's executives were still in the "early stages of determining the administrative process it [would] pursue to settled with affected counterparties," expressly stating that not a single customer or supplier had yet been notified of the misconduct, that Insight's executives "expect[ed] that the final settlement of these liabilities may take multiple years" and that the final total of the liabilities could not yet be determined with precision.  ***Yet, Bryan admitted the total "cash cost" of the liability exceeded $60 million.***

- The Company's internal controls over its accounting and financial reporting processes were still plagued with defects;

- During the Illusory Profiteering Period, Insight's senior executives had intentionally moved aged trade credits on sales made between the Company, its product suppliers and customers from its balance sheet to its income statement before it was legal to do so.  Specifically, since at least 1996, Insight's senior executives had been moving trade credits from the Company's balance sheet to its Income Statement, thereby improperly reducing the cost of goods sold reported and increasing the Company's gross profit reported in financial statements.  During 2007 and 2008, while Bryan was serving as CFO, she stated these transfers were made once the trade credits had "aged" 18 months, but could not confirm the "aged" trade credits were held the entire 18 months between 1996 and 2007, before her arrival.

- The misconduct had actually been "detected by an internal - - review that management conducted in 2008 just as it was going through its normal processes of closing out the respective quarters."

- Despite the fact that KPMG, Insight's outside auditor for its entire history as a publicly-traded (in fact since it was founded in 1988), including throughout the Backdating Period, had failed to disclose or correct the improper withholding of customer and supplier funds throughout the Illusory Profiteering Period, the Insight Board and its Audit Committee (then consisting of Defendants Fisher (Chair), Ibargüen, Jones and Pushor) were neither replacing nor seeking indemnification from KPMG for its complicity in connection with this newest multi-million dollar scandal to befall Insight on their watch.

- That due to Defendants' improper withholding of $60 million in trade credits from Insight's customers and suppliers and their illegal recognition of those sums as "earnings" during the Illusory Profiteering Period, the Company had defaulted on certain financial obligations and had been forced to seek waivers from its "bank group and other lenders," which will ultimately increase Insight's capital costs.

A.    **Defendants' Accounting for the Trade Credits Violated GAAP and Overstated Insight's Earnings**

79.    Explaining the proximate cause of the earnings restatement, Bryan would tell the *Arizona Republic* on May 14, 2009 that "they (Insight) are the victim of growing very fast." During the May 12, 2009 conference, Bryan expressly admitted "there [were] literally are hundreds of thousands of these transactions going back from 1996 to 2008." However, as Bryan admitted during the May 12, 2009 conference, the improper withholding of customer and supplier funds (whether payments or refunds) was not a mistake but reflected ***an express "policy that has been going back to 1996, with regard to the movement of these aged credits from the balance sheet to the income statement."*** Discussing the intentional decision to withhold these sums from customers and suppliers and then to illegally recognize them as "income" on Insight's books, Bryan explained:

> ***The reality is that judgment was in error. That's not how those should have been resolved so hence we're going back....new financial management came in and looked at the policies, determined that we needed to make a change, and we are now making that change.... there's a lot of transactions that we're going have to back and reconcile, and see if they're handled properly. And then in that reconciliation process, if it is determined it was not handled properly, then obviously we will do exactly what we need to do, in terms of resolving with those counterparties.***

[Emphasis added.]

31

80.     Demonstrating Insight's senior executives' and Board members' knowledge that withholding these funds from customers and suppliers was clearly improper, Bryan also explained that the Policy designed to prevent improperly withholding large customer and supplier funds – and illegally recognizing those funds as profits – did not apply, by design, to the majority of Insight's smaller customers and suppliers – those with the least amount of power to recover improperly withheld funds.  In fact, Bryan expressly stated that Insight had "policies in place with some of [its] key partners…where we do this reconciliation process on an annual basis, just because of that high-volume transaction on their side as well as our side.  ***So actually we've already had processes in place were we reconcile with our biggest partners, and now we're just talking about trying to do it across the entire population."***

81.     Yet throughout the entire Illusory Profiteering Period, ***Insight's senior accounting and finance executives, its outside and internal auditors, and the members of Insight's Audit and Executive Committee knew*** that improperly withholding customer and supplier funds and then reporting them as "profits" violated the federal securities laws, GAAP, Delaware corporate law and the Nasdaq listing requirements.  During the May 12, 2009 conference, when specifically questioned as to the potential accounting implications, Bryan expressly stated that unilaterally deciding to withhold funds from customers and suppliers, reporting these unearned funds as "earnings," and then being forced to restate earnings was governed by the same reporting rules that limit retailers' recognition of funds collected for "gift cards" that are not used.  As to the accounting treatment of funds collected for gift cards, when a company sells a gift card, it initially records a liability on its balance sheet for its obligation to the gift card's holder.  The liability is erased and revenue is recorded when the card is used or expires.  Complications arise when a card is sold with no expiration date and the holder fails to use the entire balance – potentially leaving a retailer reporting a liability on its books for years.

82.     As Pamela Schlosser of the SEC's Office of the Chief Accountant explained at an accounting conference in Washington D.C. on December 5, 2005, in these circumstances, retailers can only record revenue from unused cards if they can "reasonably and objectively" determine the percentage of gift-card dollars that go unused and the estimated time it takes consumers to spend

the cards. For cards without expiration dates or in states that don't allow them to expire, such as Washington and California, the process of recording revenue involves a review of local laws addressing "abandonment" The analysis is complicated. States such as Massachusetts do not declare property abandoned until three years of inactivity. New Hampshire requires five years.

83.   Defendant Bryan opined at the May 12, 2009 conference that the improperly withheld customer and supplier funds Insight retained were subject to these same handling and reporting restrictions. Except here, Insight (rather than the customer or supplier), unilaterally controlled the perceived "abandonment" of the funds. Rather than being "abandoned," in reality these funds were being improperly withheld by Insight's senior executives.

84.   As a March 14, 2005 *Business Week* expose entitled "Gift Cards: No Gift To Investors - They make shoppers happy, but they can distort retailers' performance measures" explains, improper accounting policies that permit liabilities such as those owed to Insight's customers and suppliers to linger on the Company's balance sheet for indeterminate periods "can be used to manage earnings." And, it is well known that executives are under tremendous pressure to meet the investment communities' earnings expectations. Exceeding expectations one quarter merely increases the Street's expectations in the next. As such, the Insight Board's failure to design, adopt and implement effective accounting controls, procedures and protocols to ensure that ***all customer and supplier accounts were periodically audited – not just the "bigger ones,"*** and to require that any unearned funds be returned immediately, exposed Insight to earnings manipulation by its executives whose compensation the Board knew was based on meeting earnings exceedingly increasing – and exceedingly harder to meet – earnings expectations. This was especially true in the case of Insight, where the Board and the Crown Brothers were relying heavily upon razor-thin profit margins in resale transactions to report profits.

85.   Insight's reported revenue was overstated as the Company was improperly accounting for its revenue associated with these improperly withheld customer and supplier funds in violation of GAAP. GAAP, as described by FASB Statement of Concepts No. 5 ¶¶83-84, requires that revenue be both earned and realizable (collectible) prior to recognition. Per SEC

Staff Accounting Bulletin ("SAB") No. 104, Revenue Recognition in Financial Statements, revenue is generally realized or realizable and earned when *all* of the following criteria are met:

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectibility is reasonably assured.

86. Insight's new CFO has admitted that Insight's senior executives caused it to violate GAAP as set forth in SAB 104 by improperly moving funds due Insight's customers and suppliers and held on its books as "liabilities" to its Income Statement as profits and has restated its financial statements for 2003 - 2008 due to this GAAP violation. Bryan has also conceded that the implementation of Insight's improper accounting Policy caused it to misstate earnings due to the Company's improper accounting treatment of trade credits dating all the way back to 1996. Insight's new CFO admitted that the Company had a Policy in place to prevent the creation of such a "slush fund" that could be drawn down at the beckon of Insight's senior executives, but that it only applied to Insight's bigger corporate customers. Finally, Insight's new CFO has conceded that even the Company's Policy of holding certain funds for 18 months before improperly converting them to income was not adhered to prior to her arrival at the end of fiscal 2007. She held the funds for the 18 months required by the Policy during fiscal 2008, but Bryan has admitted that even that was improper as it did not account for the different states' laws concerning when *and if* Insight could ever properly consider the funds "abandoned property."[2]

---

[2]     In fact, because Insight – rather than the customers and suppliers – maintained control over when or if the funds would be relinquished by Insight, CFO Bryan's statement that the accounting misstatement treatment was similar to that which occurs with expired gift cards in connection with explaining the restatement was in error as *the Insight executive's* withholding of customer and supplier funds was prefaced upon the Insight executives' intent to withhold and then improperly convert funds to profits that did not belong to Insight – rather than the failure of the customers and suppliers to obtain refunds.

87.    Due to their use of the slush fund improperly created by withholding customer and supplier funds, Insight's senior executives were able to meet or exceed the investment community's quarterly expectations, causing inflation in the Company's stock price, including:

- reaching a two-year high on reported EBITA (earnings before interest, taxes and amortization) in the 1Q 2004;

- reaching a five-year high on reported EBITA high in 2Q 2004;

- reporting 4Q 2004 earnings of $0.35 per share, in line with *Reuters* estimates consensus, and reaching a six-year high on reported EBITA;

- reaching a six-year high on reported EBITA in the 1Q 05;

- beating the *Reuters* earnings estimate for the 2Q 06 by $0.06 per share and reaching a six-year high on reported EBITA;

- beating the *Reuters* earnings estimate for the 3Q 06 by $0.02 per share;

- beating 4Q 06 estimates of $0.38 per share by reporting EPS of $0.43 per share;

- meeting *Reuters* earnings estimate for the 1Q 07;

- meeting a *Bloomberg* average estimate of four analysts for the 2Q 07;

- missing its *Bloomberg* average estimate for the 3Q 07, while reaching an eight-year EBITA high;

- beating the 2Q 08 *First Call* earnings consensus by $0.03 per share;

- announcing fiscal 2008 EPS guidance on 8/11/08 of $1.50 - $1.60 per share, beating estimates of $1.45 per share; and

- reporting 3Q 08 earnings in-line with its *First Call* consensus.

**B.    The Individual Defendants Paid Excessive Compensation Based on False Financial Reports**

88.    Insight's senior executives knew that they had to "make their numbers" each quarter to justify their outsized executive compensation packages and to keep the Company's stock price inflated in order to increase the value of their stock options.  The Insight executives' pay was based in large part on their reporting ever increasing profits – despite the razor thin profit margins the Company's resale business provided.  This is reflected in the factors Insight's Compensation Committee used each year to justify the outsized executive compensation being paid.  For instance, in justifying and explaining its compensation decisions for Defendants Fennessy, Bryan,

McGrath, and Laybourne for fiscal 2007, the 2008 Annual Proxy Statement to Shareholders stated as to "Short-Term Cash Incentive Compensation" for these executives that the Board's "cash incentive compensation plans are designed to reward individuals *for the achievement of certain defined quarterly financial objectives…."* The 2007 Annual Proxy Statement also stated that the "total target cash incentive compensation for 2007 was based 60% on non-GAAP earnings from operations (defined under the plan as the actual 2007 earnings from operations excluding expenses related to the stock option review in excess of budgeted amounts) of the Company, or the executives' respective business units," and that "*Performance is measured and paid quarterly on a sliding scale, with a minimum payout of zero and a maximum payout of 145% of the earnings from operations cash incentive target.*" The 2008 Annual Proxy Statement also explained that based on the Company's 2007 *reported quarterly financial reports*, the following Defendants received the following *cash bonus payments exceeding $2 million:*

| Name | Based on Earnings from Operations Goals | | Based on Individual Performance Goals | | Total | |
|---|---|---|---|---|---|---|
| | Target | Actual | Target | Actual | Target | Actual |
| Fennessy | $ 840,000 | $ 705,180 | $ 560,000 | $ 504,000 | $ 1,400,000 | *$ 1,209,180* |
| Bryan | 255,000 | 4,815 | 170,000 | — | 425,000 | *4,815* |
| McGrath | 300,000 | 180,195 | 200,000 | 210,000 | 500,000 | *390,195* |
| Laybourne | 480,000 | 402,960 | 320,000 | 288,000 | 800,000 | *690,960* |

Additionally, on February 13, 2008, the Compensation Committee also approved a discretionary cash bonus for 2007 for Mark T. McGrath, President, North America/APAC, in the amount of *$26,250*. As originally contemplated, 60% of Mr. McGrath's 2007 cash incentive compensation was based on the 2007 quarterly financial results of our North America operating segment. Under this measure, based on actual non-GAAP earnings from operations compared to targets, Mr. McGrath did not receive a quarterly bonus for the third or fourth quarters of 2007. *However, with respect to the fourth quarter of 2007, the Compensation Committee approved a discretionary bonus of $26,250 to otherwise recognize Mr. McGrath's contributions to the Company during the period.*

[Emphasis added.]

36

89.     The Insight Board and its Compensation Committee also weighted the Company's payout on its long-term compensation plans, including its "restricted stock unit" plan (or RSUs), based on *2007 reported earnings* as follows*:*

> *The number of RSUs issued as performance-based grants increased or decreased depending on actual EPS (for the fiscal year ended December 31, 2007, on a consolidated non-GAAP diluted basis...*compared to target EPS of $1.57. The minimum number of RSUs that could be issued was zero, and the maximum number was 130% of the target award….*Due to the over-achievement of 2007 actual EPS (as defined), as compared to the target EPS, the 2007 total number of performance-based RSUs earned by the named executive officers, as compared to the 2007 target awards, was 112% of target, as follows:*
>
> • Richard A. Fennessy, President and Chief Executive Officer — 56,000 (target — 50,000) [valued at $1.15 million];
>
> • Glynis A. Bryan, Chief Financial Officer — Not applicable;
>
> • Mark T. McGrath, President, North America/APAC — 42,000 (target — 37,500) [valued at $579,119];

[Emphasis added.]

90.     For fiscal 2007 the Insight Board also made stock option grants as part of its long-term incentive compensation scheme valued as follows: Fennessy $953,000; Bryan $3.56 million; McGrath $714,750 and Laybourne $714,750.

91.     Similarly, for fiscal 2006, these Defendants were paid the following short-term cash incentive payments: Fennessy: $1.397 million (vs. $1.203 million target) plus a discretionary bonus of $150,000; Laybourne:    $900,646 (vs. $775,750 target) plus a discretionary bonus $80,000; McGrath:   $528,418 (vs. $465,985 target), plus a discretionary bonus of $50,000; long-term incentive awards in the form of RSUs as follows: Fennessy 44,800 (target – 40,000) valued at $807,555; and Laybourne 33,600 (target – 30,000) valued at $223,916; McGrath 33,600 (target – 30,000) valued at $322,446; and long-term incentive compensation in the form of stock options: Fennessy $2.3 million; Laybourne $445,404; and McGrath $322,426.

92.     Again, for fiscal 2005, these Defendants were paid the following short-term cash incentive payments: Fennessy $1.150 million, plus a $150,000 discretionary bonus; Laybourne

$648,250, plus a $100,000 discretionary bonus; and McGrath $208,886; and long-term incentive awards in the form of RSUs as follows: Fennessy 350,000 units (valued at $1.527 million); and McGrath 200,000 units (valued at $295,800); and long-term incentive awards in the form of stock options: Fennessy $4.2+ million; Laybourne $905,000; and McGrath $2.4 million.

93.     Again, for fiscal 2004, these Defendants received the following short-term cash incentive payments: Fennessy $350,000; Tim Crown $1.634 million; Laybourne $825,000; and long-term incentive awards in the form of stock options: Fennessy $6+ million; Tim Crown $2.2 million; and Laybourne $1.2 million.

94.     ***In total, the fiscal 2004 – 2007  reported incentive compensation for the Defendants detailed in the preceding five paragraphs alone, which only accounts for the sums Insight was forced to report when these Defendants appeared as its five most highly paid executives in its Annual Proxy Statements, all of which was enhanced by the earnings misstatements, exceeded $41.3 million.***

95.     Nonetheless, despite the Company's 2008 Proxy Statement expressly providing that Insight had "an incentive compensation recovery policy that applies to [its] executive officers" and that "[u]nder this policy, in the event of a material restatement of [its] financial results, [the Board] may recover from an executive officer any incentive compensation that was based on having met or exceeded performance targets if an executive officer engaged in fraud or intentional misconduct that resulted in an increase in his or her incentive compensation," not only did the Board fail to recover from any of the Insight executives involved in the accounting misstatement, ***but certain Defendants, were actually paid additional compensation payments following the Company's earnings restatement announcement in February 2009, including McGrath who was paid over $1.4 million in severance payments, Fennessy who was paid a $450,000  short-term cash incentive award, Bryan who received a $170,000 short-term cash incentive award, and McGrath  who was paid a $100,000 short-term cash incentive award.*** Additionally, in addition to McGrath's $1.4 million severance payment, just weeks before the earnings restatement was announced, the Board entered into new employment agreements with Fennessy and Bryan

providing them $5+ million and $1.2+ million in severance benefits, respectively, in the event their employment is terminated and that termination is involuntarily.

96.    Because the Insight Board knew its senior executives could artificially inflate Insight's stock price by managing its reported "earnings," and because they knew certain executives held tens of millions of dollars worth of stock options – the value of which would increase exponentially to the extent the Company reported favorable earnings causing inflation in its stock price – and because they knew based on their own recent experiences with the backdating scandal that the Crown Brothers and their cronies would, if they could, falsify Insight's publicly-reported financial results to the extent it was personally profitable for them to do so, the Insight Board, especially its Audit and Compensation Committee members, in the proper exercise of their fiduciary duties, was obligated to design, adopt and implement internal controls that would prevent the Crown Brothers and their cronies from exploiting Insight, its customers and its suppliers.  The Insight Board, its Audit Committee and its Compensation Committee failed to do so – once again exposing Insight to potential criminal liability and hundreds of millions of dollars in criminal and/or civil fines, penalties and judgments, liability for securities fraud to its investors, professional fees and damage to reputation caused by yet another massive earnings restatement.

97.    Indeed, during the May 12, 2009 conference, Bryan was once again forced to admit that much of Insight's recent financial turmoil was again attributable to the failure of the Insight Board and its Compensation Committee to design and implement meaningful executive compensation practices, policies and protocols, stating that the Company needed to immediately take action to "decrease discretionary spend," including

- "eliminating merit increases";
- "reducing equity programs";
- "foregoing recognition events";
- "minimizing non-client travel";
- "increasing the utilization of off-shore resources"; and
- "reduce the costs associated with…third-party contracts."

39

According to Bryan, the Board's and its Compensation Committee's failure to control these expenses alone – largely related to executive compensation – was then costing the Company at least $35 million per year.

**C.      Certain Defendants Sold over $34 Million in Stock Based On Inflated Prices**

98.      Between January 1, 2004 and the present, Defendant Eric Crown sold a total of 515,600 shares of his personal Insight stock for gross proceeds of over $11.6 million dollars, taking advantage of the artificially inflated prices of Insight stock and in the face of all the non-public, materially adverse information regarding the Company.  Defendant Eric Crown's sales are detailed below:

| Date | Shares Sold | Average Price | Gross Proceeds | % of Holdings at Time of Sale |
|---|---|---|---|---|
| 4/28/2004 | 1,484 | $18.60 | $27,602 | 0.4% |
| 11/3/2004 | 50,000 | $19.00 | $950,000 | 13.7% |
| 11/5/2004 | 11,866 | $19.11 | $226,759 | 3.8% |
| 11/10/2005 | 50,000 | $21.10 | $1,055,000 | 16.5% |
| 8/14/2007 | 25,000 | $23.46 | $586,500 | 9.0% |
| 8/15/2007 | 47,189 | $23.41 | $1,104,694 | 16.4% |
| 8/16/2007 | 45,000 | $21.52 | $968,400 | 15.1% |
| 8/17/2007 | 63,000 | $23.28 | $1,466,640 | 19.9% |
| 8/20/2007 | 50,000 | $23.43 | $1,171,500 | 16.5% |
| 8/21/2007 | 65,000 | $23.43 | $1,522,950 | 20.4% |
| 8/22/2007 | 25,000 | $23.48 | $587,000 | 9.0% |
| 8/24/2007 | 27,000 | $23.52 | $635,040 | 9.6% |
| 8/27/2007 | 5,061 | $23.51 | $118,984 | 2.0% |
| 8/31/2007 | 50,000 | $23.74 | $1,187,000 | 16.5% |
| | **515,600** | | **$11,608,070** | |

99.      Between January 1, 2004 and the present, Defendant Laybourne sold a total of 476,697 shares of his personal Insight stock for gross proceeds of over $10.7 million dollars, taking advantage of the artificially inflated prices of Insight stock and in the face of all the non-public, materially adverse information regarding the Company.  Defendant Laybourne's sales are detailed below:

40

| Date | Shares Sold | Average Price | Gross Proceeds | % of Holdings at Time of Sale |
|---|---|---|---|---|
| 2/18/2004 | 51,113 | $22.04 | $1,126,531 | 100.0% |
| 7/28/2005 | 15,000 | $20.50 | $307,500 | 100.0% |
| 7/29/2005 | 25,000 | $20.52 | $513,000 | 100.0% |
| 2/2/2006 | 50,000 | $20.93 | $1,046,500 | 100.0% |
| 2/3/2006 | 50,000 | $20.92 | $1,046,000 | 100.0% |
| 8/21/2007 | 3,800 | $23.56 | $89,528 | 25.3% |
| 8/22/2007 | 22,000 | $23.56 | $518,320 | 66.3% |
| 8/23/2007 | 12,200 | $23.57 | $287,554 | 52.1% |
| 8/24/2007 | 50,000 | $23.57 | $1,178,500 | 81.7% |
| 8/27/2007 | 42,500 | $23.60 | $1,003,000 | 79.1% |
| 8/28/2007 | 4,350 | $23.55 | $102,443 | 28.0% |
| 8/29/2007 | 47,400 | $23.60 | $1,118,640 | 8.9% |
| 8/30/2007 | 53,334 | $23.64 | $1,260,816 | 82.6% |
| 8/31/2007 | 50,000 | $23.77 | $1,188,500 | 81.6% |
| | **476,697** | | **$10,786,831** | |

100.   Between January 1, 2004 and the present, Defendant Tim Crown sold a total of 431,054 shares of his personal Insight stock for gross proceeds of over $8.7 million dollars, taking advantage of the artificially inflated prices of Insight stock and in the face of all the non-public, materially adverse information regarding the Company.   Defendant Tim Crown's sales are detailed below:

| Date | Shares Sold | Average Price | Gross Proceeds | % of Holdings at Time of Sale |
|---|---|---|---|---|
| 4/28/2004 | 76,484 | $18.50 | $1,414,954 | 10.5% |
| 4/29/2004 | 25,000 | $18.16 | $454,000 | 3.8% |
| 11/3/2004 | 15,000 | $19.00 | $285,000 | 2.3% |
| 11/4/2004 | 70,000 | $19.07 | $1,334,900 | 11.3% |
| 11/5/2004 | 15,000 | $19.11 | $286,650 | 2.8% |
| 8/1/2005 | 50,000 | $20.40 | $1,020,000 | 10.6% |
| 11/9/2005 | 50,000 | $21.00 | $1,050,000 | 9.6% |
| 2/1/2006 | 50,000 | $20.91 | $1,045,500 | 8.6% |
| 8/16/2007 | 79,570 | $23.51 | $1,870,691 | 21.0% |
| | **431,054** | | **$8,761,695** | |

101.   Between January 1, 2004 and the present, Defendant McGinnis sold a total of 110,840 shares of her personal Insight stock for gross proceeds of over $2.4 million, taking advantage of the artificially inflated prices of Insight stock and in the face of all the non-public,

materially adverse information regarding the Company.  Defendant McGinnis' sales are detailed below:

| Date | Shares Sold | Average Price | Gross Proceeds | % of Holdings at Time of Sale |
|---|---|---|---|---|
| 2/26/2004 | 52,625 | $21.17 | $1,114,071 | 100.0% |
| 2/27/2004 | 293 | $21.29 | $6,238 | 100.0% |
| 11/3/2005 | 27,917 | $21.05 | $587,653 | 100.0% |
| 8/13/2007 | 23,105 | $24.05 | $555,675 | 99.0% |
| 8/17/2007 | 6,900 | $24.29 | $167,601 | 39.0% |
| | **110,840** | | **$2,431,238** | |

102.    Between January 1, 2004 and the present, Defendant Fennessy sold a total of 31,464 shares of his personal Insight stock for gross proceeds of $404,222, taking advantage of the artificially inflated prices of Insight stock and in the face of all the non-public, materially adverse information regarding the Company.  Defendant Fennessy's sales are detailed below:

| Date | Shares Sold | Average Price | Gross Proceeds | % of Holdings at Time of Sale |
|---|---|---|---|---|
| 2/14/2007 | 6,798 | $18.53 | $125,967 | 5.7% |
| 1/3/2008 | 8,422 | $17.55 | $147,806 | 7.5% |
| 2/1/2008 | 4,815 | $17.56 | $84,551 | 4.6% |
| 2/1/2009 | 5,409 | $5.18 | $28,019 | 3.8% |
| 2/14/2009 | 6,020 | $2.97 | $17,879 | 3.9% |
| | **31,464** | | **$404,222** | |

103.    Between January 1, 2004 and the present, Defendant Gunning sold a total of 6,228 shares of his personal Insight stock for gross proceeds of $130,227, taking advantage of the artificially inflated prices of Insight stock and in the face of all the non-public, materially adverse information regarding the Company.  Defendant Gunning's sales are detailed below:

| Date | Shares Sold | Average Price | Gross Proceeds | % of Holdings at Time of Sale |
|---|---|---|---|---|
| 2/27/2004 | 3,695 | $21.04 | $77,743 | 100.0% |
| 11/30/2005 | 2,533 | $20.72 | $52,484 | 100.0% |
| | **6,228** | | **$130,227** | |

104.    Between January 1, 2004 and the present, Defendant Jones sold a total of 5,593 shares of his personal Insight stock for gross proceeds of $117,453, taking advantage of the

artificially inflated prices of Insight stock and in the face of all the non-public, materially adverse information regarding the Company.  Defendant Jones' sales are detailed below:

| Date | Shares Sold | Average Price | Gross Proceeds | % of Holdings at Time of Sale |
|---|---|---|---|---|
| 2/3/2006 | 5,593 | $21.00 | $117,453 | 74.0% |

### D.   Significant Harm to Insight

105.   Because of the Board's failures, during the Illusory Profiteering Period, the Individual Defendants engaged in a series of actions to effectively allow Insight to: (a) misreport certain aged trade credits and overstating goodwill in publicly-reported financial statements and other publicly-disseminated financial reports and thereby materially overstate earnings; (b) file false and misleading financial statements not prepared in accordance with GAAP, despite claiming otherwise; (c) file false and misleading certifications required by the Sarbanes-Oxley Act of 2002 attesting that Insight had adequate internal and financial controls, when it did not; (d) permit material weaknesses to exist in the Company's internal controls over financial reporting; and (e) unlawfully mislead investors as to the accuracy of Insight's financial statements in order to artificially inflate the price of Insight securities during the relevant period, enabling certain company insiders to sell over 2,287,309 million shares of their own personally-held Insight shares for over $49 million in proceeds, including the $34 million worth sold by the Defendants named in this action.

106.   The Insight Board's utter lack of oversight and inability to implement and maintain adequate internal operational, compensation and financial controls has caused, and will continue to cause, Insight and its shareholders great harm, by: (a) indelibly damaging its reputation and loss of goodwill in general; (b) exposing the Company to a substantial likelihood of criminal and civil liability, including potential criminal and/or civil liability to the SEC and suits for violations of the securities laws; and (c) having the Company absorb the financial cost associated with its diminished market capitalization, including increased costs of borrowing.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

107.    Plaintiff brings this action derivatively in the right of and for the benefit of the Company to redress injuries suffered by the Company as a direct result of the Individual Defendants' wrongdoing.

108.    Plaintiff is, and at relevant times was, a holder of Insight common stock.

109.    At the time of the filing of this lawsuit in June 2009, the Insight Board of Directors consisted of Director Defendants Tim Crown, Fennessy, Gunning, Jones, Fisher Dorrance, Pushor, Robino and Ibargüen (identified above as the "Director Defendants").

110.    Plaintiff did not make any demand on the Director Defendants to institute this action because such demand would be a futile and useless act for the following reasons:

a.    Demand is excused because the conduct alleged herein, resulting in Insight being forced to make two consecutive earnings restatements, each one spanning nearly the Company's entire history as a publicly-reporting entity, was so reckless on its face that it could not have been the product of sound business judgment.  The wrongdoing and harm alleged in this Complaint flows directly from the Defendants' deliberate and conscious decision to withhold funds from Insight's customers and suppliers and to commit deceptive and illegal acts and to misstate and withhold material information from the investment community in order to inflate the executive compensation of the Crown Brothers and their cronies, as alleged herein, is not entitled to business judgment deference.

b.    Demand is excused upon the following Defendants who served as members of the Insight Audit Committee and the Insight Compensation Committee during both the Backdating Period and the Illusory Profiteering Period as they were each on notice as of July 2007, when the options backdating restatement was announced, *at the very latest,* that Insight was operating without internal controls and that the Crown Brothers would exploit the Company's lack of internal accounting or executive compensation controls to obtain excessive executive compensation for themselves and their cronies: members the Board's Audit Committee, including Defendants Gunning 1996-2007, Jones 1996-2004,  Fisher 2001-2007, Pushor 2005-2007, Robino

44

2005-2007; and members of the Board's Compensation Committee, including Defendants Gunning 1996-2007, Jones 1996-2007, Fisher 2001-2007, and Dorrance 2004-2007.

c.      Demand is excused upon Defendants Pushor and Dorrance who comprised the Options Subcommittee that purported to investigate and recommended to the Insight Board not to seek financial recovery from the Crown Brothers, Laybourne, or any other Insight executive or employee who received backdated stock options;

d.      Demand is excused upon Defendants Tim Crown, Laybourne, Gunning, Jones, Fisher, Pushor, Dorrance and Robino who comprised the members of the Insight Board in July 2007 when the Company's 1995-2005 earnings were restated by $30+ million and the Board decided not to seek recovery of this illegally paid compensation from the Crown Brothers, Laybourne and Insight's other senior executives and employees who received backdated stock options;

e.      Although the Director Defendants were required pursuant to their fiduciary duties as Insight Board members and as members of specific committees of the Company's Board to monitor and ensure that the operations of the Company were based on sound business judgment, the Individual Defendants failed to exercise their duties, and rather, simply caused and/or permitted Insight to engage in the reckless and misleading conduct described above, exposing the Company to millions of dollars in potential fines, penalties, civil judgments and defense costs and reputational harm.

f.      During parts of 2008 through the announcement of the 2009 earnings restatement, the Insight Audit Committee consisted of Individual Defendants Fisher (Chairman), Ibargüen, Jones and Pushor.  Among other things, Insight's Audit Committee Charter charges its members to assist the Board in fulfilling its oversight responsibilities with respect to: (i) reviewing on a continuing basis the adequacy of Insight's system of internal controls, and, to the extent required, meeting with Insight's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in Insight's periodic filings and the attestations or reports by the independent auditors relating to such disclosure; (ii) overseeing

Insight's internal audit function, with the director of the internal audit function being a direct report to the chairperson of the Committee; (iii) the independent auditors' qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditors.   Despite this charter, Defendants Fisher (Chairman), Ibargüen, Jones and Pushor approved the Company's improper financial reporting processes, including continuing to permit the trade credits to be impermissibly transferred from liabilities to the Income Statement between 2007 and 2009, including during 2008 ***after Bryant*** discovered and advised the Audit Committee that the Company had been improperly converting trade credits to reported profits and while the Audit Committee's 2008 internal investigation continued, exposing each of them to personal liability for knowingly permitting Insight to report false and misleading financial results in violation of the federal securities laws.

g.    The Director Defendants, including the Audit Committee members, also caused and/or permitted Insight to issue materially misleading financial statements during the relevant period.

h.    The Director Defendants, including the Audit Committee members, also failed to remediate and then adequately monitor the Company's financial controls following the 2007 admission Insight's accounting and executive compensation controls were defective.

i.    The Director Defendants, including the Audit Committee members, failed to remediate in 2007, and then adequately monitor and enforce the Company's internal controls, which led the Company to misreport certain aged trade credits in publicly-reported financial statements and other publicly-disseminated financial reports (thereby materially overstating earnings).

j.    The Insight Board's Compensation Committee consists of Defendants Robino (Chairman) since May 2007, Ibargüen since July 2008, and Pushor since 2005. Previously the following Defendants also served on the Compensation Committee: Gunning 1996-2007, Jones 1996-2007, Fisher 2001-2007, and Dorrance 2004-2007.  Among other things, Insight's Compensation Committee Charter charges its members to: (i) approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those

46

1   goals and objectives, and determine and approve the CEO's compensation level based on this

2   evaluation; (ii) determine the long-term incentive component of senior executive compensation;

3   (iii) review the compensation of all other officers of the Corporation and make recommendations

4   to the Board with respect thereto; and (iv) make recommendations to the Board with respect to

5   incentive compensation plans and equity-based plans.  Rather than complying with their fiduciary

6   duties and the mandate of the Compensation Committee's Charter, these Defendants caused

7   Insight to incentivize excessive risk-taking, including outright illegal acts such as options

8   backdating and financial misreporting by its senior executives.  In light of having caused Insight

9   to incentivize reckless risk-taking and illegal acts during the relevant period, demand on each of

10  these Defendants is excused as each of the Compensation Committee members is exposed to

11  additional personal liability.

12          k.      Demand is also excused on current Compensation Committee members

13  Defendants Robino (Chairman), Ibargüen, and Pushor because each of them approved the new

14  employment contracts offered to Fennessy, Bryan and McGrath in January 2009, knowing the

15  Audit Committee was investigating yet a second massive earnings restatement, which resulted in

16  Defendant McGrath receiving over $1.4 million in connection with his termination immediately

17  following the earnings restatement announcement.  Moreover, the current Compensation

18  Committee members waived Insight's right to seek disgorgement from the Insight executives who

19  received over $41 million in cash bonuses and long-term incentive compensation (including RSUs

20  and stock options) between 2004 and 2007 based on what Defendants now concede were false and

21  misleading financial reports.

22          l.      Demand is also futile on Director Defendants Fisher, Ibargüen, Jones and

23  Pushor who comprised Insight's Audit Committee at the time its most recent restatement was

24  announced in February 2009 because despite KPMG's complicity in the 2007 Backdating

25  restatement and the 2009 Illusory Profiteering restatement, and its having collected millions and

26  millions of dollars each year from Insight for a job obviously not done well, not only has the

27  Audit Committee not attempted to seek contribution and/or damages from KPMG, these Director

28  Defendants once again selected KPMG as Insight's "independent outside auditor" for the 21st

1    year running.  Indeed the Audit Committee says it is considering appointing KPMG as Insight's

2    "independent auditor" again in 2010!   Not only was KPMG complicit in performing the

3    perfunctory auditing received at the direction of the Audit Committee during both the Backdating

4    Period and the Illusory Profiteering Period, but the Compensation Committee had also relied upon

5    KPMG to provide executive compensation consulting services during both of these Periods as

6    well.  Indeed, as the Company's Annual Proxy Statement to Shareholders explained in May 2002,

7    two months before the Sarbanes Oxley Act of 2002 went into effect outlawing the provision of

8    executive compensation "consulting" by "independent auditors," precisely because Congress

9    expressly found that it compromised their independence,

> The Compensation Committee and the Co-Chief Executive Officers (prior to
> June 2001, Timothy A. Crown and Eric J. Crown shared the role of Chief
> Executive Officer) commissioned KPMG LLP, in 1997…to analyze and
> review the competitiveness of our executive compensation. The analyses
> have provided the basis for recommendations and approvals with respect to
> the terms and provisions included in the current executive employment
> agreements.   The analyses provided information regarding "peer"
> compensation levels and long-term incentive compensation obtained from
> publicly held company reports and SEC filings, executive compensation
> surveys and other relevant sources. The Co-Chief Executive Officers and the
> Compensation Committee separately met with KPMG LLP…to review their
> findings. The Compensation Committee and the Co-Chief Executive
> Officers considered all these findings in setting executive compensation

17   Because KPMG was clearly complicit in providing deficient auditing services to Insight between

18   1995 and the present and facilitating the payment of excessive compensation to Insight's senior

19   executives – including the Crown's – through the ill-fated "abandoned property" treatment, at the

20   direction of the Crowns, *and received millions of dollars for doing so,* the Audit Committee

21   should not have reappointed KPMG as Insight's outside auditors again.  By re-appointing KPMG

22   and recommending in May 2009 that Insight's shareholders ratify their selection at the June 23,

23   2009 annual shareholder meeting, the Audit Committee had already taken a public position as of

24   the time of the filing of this Complaint that it would not place blame on the participants in this

25   debacle – including KPMG and themselves.  Because independently investigating these claims

26   and recommending that Insight seek recovery from themselves – an perhaps KPMG – would

27   require these Defendants to change course on already entrenched positions, presuit demand on

28   Director Defendants Fisher, Ibargüen, Jones and Pushor would have been futile.   This is

especially true since KPMG would likely assert an *in pari delicto* defense in response to any charges Insight's executives attempted to bring against them, due in large part to the fact that certain members of Insight's Board, Audit and Compensation Committee received financial benefits as a result of the misstated financial reports.  Such a defense would not succeed in a claim filed by a shareholder plaintiff, but it might succeed if Insight's complicit executives and directors attempted to seek damages from KPMG.

m.       Demand is futile upon Director Defendants Tim Crown who sold over $8.7 million, Fennessy who sold over $404,000, Gunning who sold over $130, 000 and Jones who sold over $117,000 of Insight stock at inflated prices during the Illusory Profiteering Period as these Defendants cannot objectively determine to sue themselves or other Defendants, including Eric Crown, Laybourne and McGinnis, for selling stock at inflated prices during the Illusory Profiteering Period as it would only draw their own sales into scrutiny;

n.       The Individual Defendants, including the Audit Committee and Compensation Committee members, participated in, acquiesced in, or approved the acts or omissions or recklessly disregarded the wrongs alleged herein, and did so in affirmative violation of their duties to the Company and its shareholders and have permitted the wrongs alleged or have remained inactive although they had knowledge or notice of those wrongs.

o.       Through gross negligence, mismanagement or reckless or intentional misconduct, the Director Defendants exposed Insight to millions of dollars in potential fines, penalties and damages in connection with the SEC inquiry and pending securities class action lawsuits and irreparably diminished Insight's reputation and standing in the information technology community.

p.       Because of their participation in the mismanagement of the Company, gross dereliction of fiduciary duties, breaches of the duties of good faith and loyalty, waste of Insight's corporate assets, and abuse of their control of Insight, the Director Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities class action lawsuit.  The Director Defendants cannot defend their

actions by any alleged "independent" business judgment since each of them acted in bad faith, grossly and recklessly abused their discretion, acted in breach of their fiduciary duties to the Company and its stockholders and failed to act and abdicated their functions and duties as directors.

111.   As such, a majority of the Director Defendants are not independent either because they are subject to liability for the misconduct alleged herein (as described in the preceding paragraph) or, by virtue of their personal, professional and/or financial relationships with the Individual Defendants who are subject to liability for the misconduct alleged herein, are conflicted from complying with their fiduciary duties and prosecuting the claims alleged herein for the following, and other, reasons:

a.   As hands-on managers of Insight, Defendants Tim Crown and Fennessy directly oversaw and orchestrated the misconduct alleged in this action and thus would be biased in determining whether to bring suit against themselves.

b.   As Defendant Fennessy (Insight's CEO) continues to rely on the other Director Defendants for his entire livelihood, presuit demand upon Fennessy to bring suit against the other Board members would have been futile;

c.   Demand was futile upon Defendants Gunning, Fisher, Dorrance, Jones and Pushor due to their extensive professional and financial ties to the Arizona real estate market, the Valley of the Sun Bowl Foundation d/b/a Insight Bowl and The Arizona Sports Foundation d/b/a Fiesta Bowl, the not-for-profit entities that conduct the Insight and Fiesta Bowl games and related activities to which Insight pays well over $1 million per year in sponsorship and related fees. Gunning is a lifetime director of both Valley of the Sun and the Arizona Sports Foundation, and is integral to its operations and selection of locations where the bowls will be played each year. Laybourne is CFO of the Arizona Sports Foundation and has relied upon that employment for his livelihood for a number of years.  Fisher is a director and the Treasurer both entities.  Insight is, and has for many years been, an official sponsor of the Insight Bowl and the Company's senior executives use the events to entertain customers, suppliers and employees.  This post season bowl game got its start in April 1989, when the NCAA gave its stamp of approval to the non-profit

50

Copper Bowl Foundation to hold the game in Tucson's Arizona Stadium under the name the Copper Bowl.  For many years the Copper Bowl enjoyed success in Tucson hosting regional match-ups featuring some of the best players in college football.  In 1997, the Arizona Sports Foundation, the operating body of the Fiesta Bowl, assumed the operating responsibilities of the Bowl and signed a letter of agreement to acquire the Copper Bowl.  Under the direction of the Arizona Sports Foundation, the Copper Bowl was transformed into the Insight Bowl when Insight Enterprises stepped in and signed a long term deal to be title sponsor of the game.  The Arizona Sports Foundation now operates two Bowls and Insight sponsors both.  So important to Insight are the bowls – and so important to the bowls is Insight – that Insight CEO Fennessy rings the Nasdaq opening bell to commemorate each bowl.  As reported by *Bloomberg* on August 15, 2005:

> "This energized match-up between two powerhouse conferences brings new excitement to the Insight Bowl and ***promises to draw tens of thousands of passionate football fans to our home base*** while showcasing our brand across the country," said Rich Fennessy, Insight CEO.  "We expect to see record attendance at the games as well as increased national TV viewership and media attention.  It's good for our company, but ***it's also great for the community***."

[Emphasis added.]

As their positions as CFO, treasurer and lifetime director of the Arizona Sports Bowl provide significant financial and professional benefit to Defendants Gunning and Fisher, presuit demand is excused as to these Director Defendants as they will not bring suit against Laybourne, Eric and Tim Crown, Fennessy, Jones, Pushor or Dorrance, or any other Insight executives or Board Members, as to do so would jeopardize their own professional and personal financial interests, something they will not do.  For his part, Gunning is somewhat of a local real estate tycoon, due in large part to his relationship with Insight and being a lifetime director of the Arizona Sports Foundation, which determines each year where the bowls will be held, with huge financial ramifications for the surrounding property values.  For instance, in November 2008, Defendant Gunning's MLBB LLC in Scottsdale, sold 20 acres of commercial land at the northwest and southwest corners of Ray and Hawes roads in Mesa, Arizona for $5.14 million that they purchased in 2006 for $4.2 million, using Grubb & Ellis Commercial in Phoenix as a broker. Gunning and MLBG LLC also have these same Grubb & Ellis brokers marketing a 161-acre

51

parcel west of Phoenix in Maricopa County that is targeted for mixed uses.  The property, which is being zoned to allow commercial, office and industrial buildings, is located at the southwest corner of Dysart Road and Northern Avenue.  The proposed zoning request, which will be compatible with the nearby Luke Air Force Base, is expected to include 120 acres of office/industrial, 18 acres of commercial and 20 to 25 acres is expected to be purchased by the Arizona Department of Transportation (ADOT).  From 1992 – 2001, Defendant Jones was senior vice president and general counsel of Del Webb Corporation, a huge Arizona developer of master-planned residential communities, with whom Jones still maintains significant financial and professional ties.  Dorrance has been a Managing Director of DMB Associates, a real estate service company based in Scottsdale, Arizona, since 1984, and relies on his professional relationships with Gunning, Laybourne, Jones and Pushor for his livelihood.  At the time the original complaint was filed, Pushor was serving as the president and CEO of the Greater Phoenix Chamber of Commerce and previously served as CEO of the Arizona Lottery Commissioner.

d.      Demand is also futile upon Tim Crown, who along with his brother Eric Crown, founded Insight.  The Crown Brothers, along with Laybourne, ran Insight as their own private fiefdom for many years and due to his complicity in the misconduct alleged herein, and that of this brother and his compatriots, Tim Crown could not independently and disinterestedly consider a presuit demand.  For instance, on March 27, 2009, Eric Crown, along with Orbitron Holdings LLC, an Arizona limited liability company allegedly owned and operated by Tim Crown and Eric Crown, was sued for, among other things, breach of fiduciary duty, unjust enrichment and fraud by business co-venturers in *Explosive Productions, LLC v. Orbitron Holdings, LLC, et al.*, Superior Court of Arizona, Maricopa County No. CV2009-010082.  Plaintiffs in that action, which seek punitive damages, allege that Eric Crown and Orbitron, on behalf of 944 Media Magazine (allegedly also controlled by Eric Crown), defrauded their business partners in connection with promoting a four-day for-profit party that ran in Scottsdale in connection with the 2008 Super Bowl.  Tickets for the "944 Super Bowl Village" ranged from $100 to $1,000 (for private cabanas) with entertainment that included 50 Cent, Wyclef Jean, Velvet Revolver, Paris Hilton, Justin Timberlake, and Vince Vaughn, as well as a boxing match

featuring Hector Camacho Jr.  The suit claims that Eric Crown took $180,000 worth of tickets and a VIP cabana for three nights without paying for them and that Eric Crown's "primary interest in 944 Media and 944 magazine was the access it gave him to young, attractive models and other women, whom he hoped to date."  The complaint also alleges that "[u]nbeknownst to Explosive Productions…, 944 Media had grown expenses to over $2.4 million, far more than had ever been approved," and that "944 Media, while assuring their partners that ticket sales and sponsorships were outstanding, knew that they had actually sold fewer than 1,000 tickets, had sold only about half of the cabanas, and had obtained barely 20% of the projected sponsorship amounts."  The complaint alleges that Eric Crown and the other defendants lied to their co-venturers about the ticket sales level in order to obtain additional funding for the event, and that "[o]nly [on the third night of the event] did Explosive Productions learn that the event had been a financial disaster" and that "the overflowing facility was not the result of great ticket sales but rather the result of 944 Media having given away literally thousands of tickets each night to its friends, business partners, and the potential magazine models lured to the party for several purposes….."  According to the complaint, the "final numbers provided by 944 Media were grim.  Revenues totaled less than $1.6 million while expenses totaled more than $2.4 million."  In conclusion, the complaint alleges that,

> The truth is that 944 Media lied to its partners, city officials, and the public about ticket sales, cabana sales, and sponsorship sales.  It lied about staying within budget and not expanding the project unless revenues actually received justified expansion.  It lied about the need to bring in an outside food and beverage vendor because of the supposed exploding growth of the event.

Yet again Insight's name was drug through the mud: ¶13 of Explosive Production's complaint alleges that "[s]ince 2005, Eric Crown has been a major and active investor in 944 Media LLC. Indeed, 944 Media has bragged in at least one press release that it is '[p]ublicly backed by Tim and Eric Crown, founders of insight.com (ranked 537 on the Fortune 1000 list).'"

       e.      Demand is futile upon Defendants and Ibargüen and Robino as they are otherwise employed in the same semi-conductor industry that Insight competes in.  Ibargüen is chairman of the board of Alliance Global Services and Alliance Life Sciences Consulting,

privately-held IT consulting firms which were previously part of Alliance Consulting Group, where Ibargüen was president and CEO from 2004 to 2008.  Alliance Consulting operates in the same "solutions provision" industry as Insight.  Robino was a director of Memec Group Holdings Limited, a global distributor of specialty semiconductors, from 2001 until the sale of that business to Avnet, Inc. in 2005.  Because Ibargüen and Robino derive their livelihood from the same semiconductor sales industry that Insight operates in, they cannot exercise their fiduciary duties to independently and disinterestedly investigate and prosecute the claims alleged herein.

f.      Demand is also futile upon Defendant Robino as Robino served as a non-executive director of Memec Group Holdings Limited, a global distributor of specialty semiconductors, from 2001 until the sale of that business to Avnet, Inc. in 2005, and then served as president of Avnet from 2004 to 2008, during which time Insight acquired Calence from Avnet for $125 million.  Avnet remains a significant customer of Calence's outsourcing services.

g.      Based on the particularized facts above, to properly prosecute this lawsuit, the Individual Defendants would have to sue themselves, requiring them to expose themselves and their colleagues to potentially hundreds of millions of dollars in civil liability and sanctions. This they will not do.

h.      Further, the Company's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste, and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, which they caused the Company to purchase with corporate funds for their protection – monies belonging to Insight stockholders.  However, due to certain language in directors' and officers' liability insurance policies, the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions which eliminate coverage for any action brought directly by Insight against these Individual Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain Company officers, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought

derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effect a recovery.

## AIDING AND ABETTING AND CONCERTED ACTION

112.   In committing the wrongful acts alleged herein, each Individual Defendant has pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

113.   The purpose and effect of the Individual Defendants' common course of conduct was, among other things, to disguise their violations of law and breaches of fiduciary duty, and to enhance executive and directorial positions and receive substantial compensation and/or fees as a result thereof.

114.   The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the relevant period.  During this time, the Individual Defendants caused the Company to violate the law and conceal the true fact that Insight was, among other things, misrepresenting the financial status of its business.

115.   The Individual Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently violate state and federal law, the federal securities laws, and abdicate their duties as directors.  Each Individual Defendant was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

116.   Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

117.   At all times relevant hereto, each Individual Defendant was an agent of each of the other Individual Defendant and was at all times acting within the course and scope of such agency.

### COUNT I
### Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty
### (Against the Individual Defendants)

118.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

119.   The Individual Defendants each owed Insight and its shareholders the highest fiduciary duties of loyalty, good faith, candor, obedience and due care in managing and administering the Company's affairs.

120.   The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls and financial affairs of Insight.  By virtue of their duties of loyalty, good faith, candor, obedience and due care:

a.   The Individual Defendants were required to exercise reasonable control and supervision over the Company's officers, employees, agents, business, and operations;

b.   The Individual Defendants were required to make inquiries, use sound business judgment, and remain informed about Insight's financial performance and operations, and upon receiving notice or information of an imprudent, unsound or unlawful decision, condition, or practice, the Individual Defendants were required to undertake a reasonable investigation in connection therewith, were required to undertake steps to correct the decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright manner; and

c.   The Individual Defendants were required to prevent and then report to Insight's shareholders the Company's unlawful withholding of customer and supplier funds, their decision not to seek recovery against Insight's directors, executives and employees who received backdated stock options, their excessive compensation practices and the issuance of false and misleading financial reports, thereby exposing Insight to potential criminal liability and hundreds of millions of dollars in potential civil liability to customers, suppliers, regulators and investors.

56

121.   The Individual Defendants breached their fiduciary duties owed to Insight and its shareholders, or aided and abetted in the breach of other defendants' fiduciary duties, by willfully, recklessly, intentionally and/or negligently failing to perform their fiduciary duties.  They caused the Company to waste valuable assets, unnecessarily expend corporate funds, and failed to properly oversee Insight's business, and participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of, rendering them personally liable to the Company.

122.   Each of the Individual Defendants had actual or constructive knowledge that they had caused and/or permitted the Company to unlawfully withhold customer and supplier funds; fail to seek recovery against Insight's directors, executives and employees who received backdated stock options; pay excessive compensation to Insight's directors, executives and employees; and/or improperly misrepresent the financial performance of the Company and fail to correct those representations.

123.   All Individual Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

124.   The Individual Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

125.   As a direct and proximate result of Individual Defendants' breaches of their fiduciary duties of loyalty, good faith and due care, and aiding and abetting those breaches, and *ultra vires* misconduct, as alleged herein, Insight has sustained and continues to sustain significant damages and a drastic diminution in value.  As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

**COUNT II**
**Gross Mismanagement**
**(Against the Individual Defendants)**

126.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

127.   As detailed more fully herein, the Individual Defendants each owed a duty to Insight and its shareholders to prudently supervise, manage and control Insight's operations.

57

128.   The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties to prudently manage Insight's business and assets.

129.   As such, the Individual Defendants subjected Insight to the unreasonable risk of substantial losses by failing to exercise due care and by failing to use sound business judgment, including their failure to understand and monitor the Company's operational and financial performance.  The Individual Defendants breached their duties of due care and diligence in managing and administering Insight's affairs and by failing to prevent a waste of Company assets.

130.   When discharging their duties, the Individual Defendants knew or recklessly disregarded the wrongful conduct described herein, and either approved management's activities or failed to supervise such activities in accordance with their duties.  The Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of Insight and its assets.

131.   As a direct and proximate result of the Individual Defendants' gross mismanagement, Insight has sustained and continues to sustain significant damages and a drastic diminution in value.  As a result of the misconduct alleged herein, all Individual Defendants are liable to the Company.

**COUNT III**
**Corporate Waste and Gift**
**(Against All Defendants)**

132.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

133.   Because of the Individual Defendant's misconduct, including their failure to recover the $30 million in previously misreported executive compensation in Insight paid to executives and employees during the Backdating Period, the $15 million Insight paid to investigate and litigate the options backdating practices, the $40+ million in excessive compensation paid during the Illusory Profiteering Period, or the costs associated with investigating and restating past earnings in connection with the trade credits restatement, Insight has incurred millions of dollars in costs and fees.  The Company is also exposed to potential criminal liability.

134.   By failing to properly consider the interests of the Company and its public shareholders and by failing to conduct proper supervision, the Individual Defendants, without any

valid corporate purpose, have caused Insight to waste valuable corporate assets solely for the financial gain of those Individual Defendants who previously received the financial benefit of backdated stock options and received cash bonuses and other incentive compensation based on false financial reports issued during the Illusory Profiteering Period.

135.    In return for such wrongful diversion of corporate assets, Insight received no consideration, or consideration so disproportionately small, as to lie beyond the range at which any reasonable person might be willing to accept, rendering the transactions in effect a gift to these defendants.

136.    The conduct of the Individual Defendants, and each of them, was not in good faith, nor did the Individual Defendants make any judgment, in the exercise of good faith, that based on the circumstances of which they were fully aware the transactions were worthwhile to Insight. Rather the Individual Defendants intentionally and directly diverted Insight's assets to their own use or benefit.

137.    As a result of the Individual Defendants' wrongful conduct, and the wrongful conduct of each of them, Insight has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial. Insight is also entitled to disgorgement of the compensation obtained by the Individual Defendants as stock, options, salaries, bonuses, and other economic and non-economic compensation which would not have been paid but for their wrongful conduct.

138.    As a result of the conduct alleged herein, the Individual Defendants have unreasonably and unnecessarily caused Insight to waste valuable corporate assets.

139.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, Insight has sustained and continues to waste precious corporate assets and thus sustain damage.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT IV**
**Abuse of Control**
**(Against All Individual Defendants)**

140.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

59

141.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Insight for which they are legally responsible.

142.   As a direct and proximate result of the Individual Defendants' abuse of control, Insight has sustained significant damage to its reputation and standing in the business communities it operates in; is exposed to potential criminal liability and tens of millions of dollars in civil fines, penalties, and damage awards; was forced to erase $30 million of previously reported profits in connection with its past options backdating practices yet obtained no recovery from the executive and employees who received improper and excessive compensation; and paid out over $15 million in connection with the backdating restatement; was forced to take a $60+ million charge in connection with the Illusory Profiteering restatement and will pay out millions of dollars in connection with that restatement, without obtaining any financial recovery from its defalcating executives . As a result of the misconduct alleged herein, the Individual Defendants, either directly or through aiding and abetting, are liable to the Company.

**COUNT V**
**Unjust Enrichment**
**(Against Individual Defendants)**

143.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

144.   By their wrongful acts and omissions, including their receipt of millions of dollars in excessive compensation wrongfully paid to them based on inflated financial results during the Illusory Profit Period and not being required to return excessive compensation wrongfully paid to them during the Backdating Period, even after Insight was forced to restate previously reported financial results, Defendants Eric Crown, Tim Crown, Laybourne, Fennessy and McGrath were unjustly enriched at the expense of and to the detriment of Insight. Plaintiff also seeks recovery against all Insider Selling Defendants, including Defendants Eric Crown, Tim Crown, Laybourne, Fennessy, Jones, McGinnis and Gunning.

145.   Plaintiff, as a shareholder and representative of Insight, seeks restitution from these Defendants, and each of them, and seeks an order from the Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct fiduciary breaches.

60

**COUNT VI**
**For Accounting**
**(Against All Defendants)**

146.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.   As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

148.   As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in schemes to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct. Despite being required to restate over $30 million in previously reported earnings as result of the backdating scheme, and spending $15 million in professional fees, the Insight Board opted to waive Insight's right to recovery in favor of their friends and compatriots.  Again, after being forced to take another $60 million charge and to restate the Company's 2004 – 2007 earnings in connection with the trade credits restatement, the Insight Board declined to seek recovery of the $40+ million in cash bonuses and other incentive compensation paid to Insight's senior executives alone based on misstated earnings reports.

149.   The Individual Defendants possess complete and unfettered control over the improperly issued stock option grants, the decision not to seek recovery of excessive executive compensation paid and the books and records of the Company concerning the details of these improper payments.

150.   As a result of the Individual Defendants' misconduct, the Company has been damaged financially and is entitled to a recovery as a result thereof.

151.   Plaintiff demands an accounting be made of all executive compensation payments or grants made to any of the Individual Defendants, including, but not limited to, the dates of the payments and/or grants, the amounts of the payments and/or grants, the value of the payments and/or grants, the recipients of the payments and/or grants, the dates any stock options were

exercised and the shares received were sold, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of any Insight shares sold.

### PRAYER FOR RELIEF

THEREFORE, Plaintiff demands judgment in the Company's favor against the Individual Defendants as follows:

A.    Determining this action is a proper derivative action, Plaintiff is an adequate representative on the Company's behalf, and demand is excused;

B.    Determining the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Insight;

C.    Declaring that the Individual Defendants are obligated to indemnify and hold Insight harmless from any fines, penalties, judgment, settlement or award pursuant to any SEC enforcement actions or the class actions pending or to be filed against Insight or its employees or agents;

D.    Awarding Insight exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of the Individual Defendants to the community according to proof at trial;

E.    Awarding Insight restitution from each Individual Defendant, each recipient of backdated stock options, and every Insight executive who's incentive compensation was improperly enhanced by the withholding of customer and supplier funds and misreporting of those illusory profits;

F.    Awarding Insight equitable or injunctive relief as permitted by law;

G.    Awarding Insight money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure Defendants do not participate therein or benefit thereby;

H.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful

conduct, including all salaries, bonuses, fees stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

I.      Awarding Insight punitive damages;

J.      Directing Insight to take all necessary actions to reform and improve its corporate governance, accounting policies and internal controls to comply with GAAP and the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' Bylaws and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

i.      an amendment to the Company's Bylaws prohibiting either of the Crowns from serving as executives or directors of Insight for at least five years;

ii.     an amendment to the Company's Bylaws providing for three shareholder nominated directors each year;

iii.    an amendment to the Company's Bylaws destaggering the Board;

iv.     an amendment to the Company's Bylaws limiting the number of executive directors on the Insight Board to one;

v.      an amendment permanently and formally separating the roles of CEO and Chairman and providing for a permanent non-executive Chairman;

vi.     a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

vii.    establish an effective Audit Committee, staffed fully with independent directors, the financial expertise Sarbanes Oxley requires, and provided a budget to retain independent counsel and advisors;

viii.   require that the Board's Audit Committee appropriately test, on at least an annual basis, and then strengthen the internal audit and control functions;

ix.     reform executive compensation so as to remove incentive to inflate financial results and/or take on excessive risk;

x.      provide an annual "say on pay" vote for shareholders;

1          xi.    develop and implement effective insider trading protocols and

2  policies; and

3          xii.    permit shareholders to question all executive directors of Insight at the

4  Annual Shareholder Meeting and establish a more transparent process for receiving and

5  evaluating shareholder proposals.

6          K.    Awarding pre-judgment and post-judgment interest as allowed by law;

7          L.    Awarding Plaintiff the costs and disbursements of this derivative action,

8  including reasonable attorneys' fees, costs and expenses; and

9          M.    Granting such other and further relief as the Court deems just and proper.

10                              **JURY DEMAND**

11      Plaintiff demands a trial by jury on all issues.

12      DATED: August 5, 2009.          **SCOTT+SCOTT LLP**

13

14                                      By:  _s/ Mary K. Blasy_____
                                        MARY K. BLASY (admitted *pro hac vice*)
15                                      ARTHUR SHINGLER III
                                        HAL D. CUNNINGHAM
16                                      600 B Street, Suite 1500
                                        San Diego, CA 92101
17                                      Tel.:   (619) 233-4565
                                        Fax:   (619) 233-0508
18
                                        SCOTT+SCOTT LLP
19                                      DAVID R. SCOTT
                                        108 Norwich Ave.
20                                      Colchester, CT 06415
                                        Tel.:   (860) 537-5537
21                                      Fax:   (860) 537-4432

22                                      SCOTT+SCOTT LLP
                                        JUDY SCOLNICK
23                                      29 West 57th Street, 14th Floor
                                        New York, NY 10019
24                                      Tel.:   (212) 223-6444
                                        Fax:   (212) 223-6334
25
                                        TIFFANY & BOSCO, P.A.
26                                      Richard G. Himelrick (#004738)
                                        J. James Christian (#023614)
27                                      Third Floor Camelback Esplanade II
                                        2525 East Camelback Road
28                                      Phoenix, Arizona 85016-4237
                                        Tel.:   (602) 255-6000
                                        Fax:   (602) 255-0103

64

DOYLE LOWTHER LLP
WILLIAM J. DOYLE II
JIM HAIL
9466 Black Mountain Road, Suite 210
San Diego, CA 92126
Tel.:   (619) 573-1700
Fax:   (619) 573-1701

THE LAW OFFICE OF NICHOLAS
KOLUNCICH III, LLC
NICHOLAS KOLUNCICH
6501 Americas Parkway, Suite 620
Albuquerque, NM 87107
Tel.:   (505) 345-0605
Fax:   (505) 889-8240

Attorneys for Plaintiff

VERIFICATION

I, ROBERT P. BACA, declare that I have reviewed the Amended Verified Shareholder

Derivative Complaint, prepared on behalf of Insight Enterprises, Inc., and authorize its filing. I have

reviewed the allegations made in the complaint, and to those allegations of which I have personal

knowledge, I believe those allegations to be true.  As to those allegations of which I do not have

personal knowledge, I rely on my counsel and their investigation and for that reason I believe them

to be true.  I further declare that I am a current holder, and have been a holder, of Insight enterprises

Inc. common stock at times relevant to the allegations in the Complaint.

August 5, 2009
Date

OFFICIAL SEAL
NICHOLAS KOLUNCICH III
Notary Public
State of New Mexico
My Commission Expires ___ 11-30-10

Sworn to before me on this date August 5, 2009

_____
Robert P. Baca