```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF ARIZONA
 2

 3   ROBERT BACA,                     )
                                      )
 4                   Plaintiff,       )
                                      )
 5        vs.                         )   No. 2:09-cv-01283-SRB
                                      )
 6   TIMOTHY CROWN, et al.,           )   Phoenix, Arizona
                                      )   June 7, 2010
 7                   Defendants.      )   3:55 P.M.
                                      )
 8

 9                   TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE SUSAN R. BOLTON
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:          By: Judith Scolnick
                                 SCOTT & SCOTT LLP
13                               500 5th Ave., 40th Floor
                                 New York, NY 10110
14

15   For the Defendant/Insight:  By: Joel Philip Hoxie
                                 SNELL & WILMER LLP
16                               1 Arizona Center
                                 400 E. Van Buren
17                               Phoenix, AZ 86005

18   For the Individual          Brian Thomas Glennon
     Defendants:                 LATHAM & WATKINS LLP
19                               355 S. Grand Ave., Ste. 100
                                 Los Angeles, CA 90071
20

21
     Electronic Court Reporter   Mags Everette
22
     Transcription Service:      AVTranz
23                               845 N. 3rd Ave.
                                 Phoenix, AZ 85003
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription services.
```

 1              THE CLERK:  All rise.  Court is now in session.

 2         Good afternoon.  Please sit down.

 3         Civil case 09-1283, <u>Robert Baca v. Timothy Crown and</u>

 4    <u>others</u>, time set for hearing regarding Defendants' motion to

 5    dismiss case.

 6              Counsel, please announce your presence for the

 7    record.

 8              MS. SCOLNICK:  Good afternoon, Your Honor.  Judy

 9    Scolnick with the firm Scott & Scott for the Plaintiff, Robert

10    Baca.

11              MR. HOXIE:  Good afternoon, Your Honor.  Joel Hoxie,

12    Barb Dawson, and Joe Adams of Snell & Wilmer on behalf of the

13    nominal defendant, Insight Enterprises Inc.

14              MR. GLENNON:  Good afternoon, Your Honor.  Brian

15    Glennon of Latham & Watkins.  With me this afternoon are Andrew

16    Farthing and Adam Regolie, also of Latham & Watkins on behalf

17    of the individual defendants.

18              THE COURT:  As I believe we did on the first round of

19    oral argument on the motions to dismiss, what I would like to

20    do is hear from counsel for the Defendants first.  The order is

21    not important to me, whether it's on behalf of nominal

22    Defendant Insight and then the individuals, or vice versa, then

23    hear one argument from Plaintiff, and then brief reply from

24    each defense counsel if both need to reply.

25              So, will you proceed first then, Mr. Hoxie?

1          MR. HOXIE:  Thank you, Your Honor.

2          May it please the Court, Joel Hoxie on behalf of

3     nominal Defendant Insight Enterprises.

4          Three main points I would like to make during this

5     oral argument, Your Honor.  The first is that the board

6     composition at Insight, that alone poses a big problem for

7     Plaintiff, especially since the latest complaint, the second

8     amended complaint, has abandoned the accounting for a trade

9     credit issues and focuses solely on alleged stock option

10    backdating.

11         At the last hearing Your Honor noted that the Insight

12    board did not look like, quote, "Your average interested

13    board," where a majority of the board members are officers of

14    the corporations or employees of the corporation.

15         For purposes of the current pleading, the second

16    amended complaint, we are now dealing with a ten members board

17    versus the nine member board we had the last time we were here

18    in late November.  Nine of those ten directors are outside

19    directors.

20         Another problem for the Plaintiff since he has

21    abandoned age trade credit accounting and is now writing the

22    option backdating course is that four of the current nine

23    outside directors joined the inside board after the so-called

24    "backdating period," which began, according to the second

25    amended complaint, on January 24, 1995 and ended at year end

1   December 2005.  Those four that joined the board after this so-

2   called period were Mssrs. Robino, Lamneck, the new CEO at

3   Insight as of January 2010, Ibarguen, and Woods.  That leaves

4   six directors.

5          In Plaintiffs' opposition brief, the brief does not

6   contend that Ms. Poushor is interested or lacks independence,

7   so that takes us down to five of the ten, and so right off the

8   bat Plaintiff is dealing with a bare minimum of five directors

9   under Delaware law that the second amended complaint would have

10  to plead particularized facts creating a reasonable doubt that

11  they're each disinterested or lack independence, and so that

12  leaves Tim Crown, Mssrs. Gunning, Jones, Fisher, and Dorrance.

13         And all but Mr. Crown, the second amended complaint

14  merely alleges that they were at various points in time but not

15  specifically members of the Insight compensation  committee.

16         The second point I would emphasize is that Plaintiff

17  has a major standing problem as a derivative plaintiff.  We can

18  forget about the latest wrinkle which we made brief mention to

19  in our briefs that for the first time Mr. Baca is now

20  purporting to be a beneficial owner, not a direct owner of

21  stock.  That's new in paragraph 10 of the second amended

22  complaint and in the Exhibit A to the second amended complaint,

23  which is a redacted brokerage firm statement which simply

24  refers to Robert P. Baca, trustee.

25         But the Court has already ruled in this case that

1    under Rule 23.1 Mr. Baca has to allege he was a shareholder at

2    a time of the transaction complained of, and since we're

3    talking about stock option backdating allegations and a

4    purported scheme that spans ten years, the case law says that

5    he would have to, to have standing to challenge option grants

6    during that ten year period he would have to be a stockholder

7    during the entire time.

8          But the complaint now alleges that Mr. Baca, whether

9    directly or beneficially, didn't become a stockholder until

10   July 19, 2002, i.e. only for the last two and a half years of

11   the alleged period.

12         Now in the opposition brief Mr. Baca concedes that he

13   lacks standing to challenge any of the grants that occurred

14   before July 19, 2002.  But even as to this remaining two and a

15   half year period, the second amended complaint fails to

16   identify one single grant that allegedly was backdated.  And

17   that's conceded in the opposition brief at pages 13 and 14,

18   which leads to the third and last point I would like to make,

19   and that is that the failure to identify any option grants is a

20   big problem from a pleadings standpoint under the case law that

21   we've discussed in our moving papers.

22         This Court already noted the last time when you

23   issued your order on January 8 of this year that the first

24   amended complaint had failed to allege with particularity

25   which, if any, of the option grants were improperly backdated.

1          Now that the second amended complaint is all about

2     backdating, it is especially problematical that this latest

3     pleading fails to cure that defect and identify any particular

4     grant that they think was backdated.

5          And curiously, in every backdating case the

6     plaintiffs do cite in their papers the specific option grants

7     being challenged were identified by date, number of options,

8     recipient, strike price, and we discuss six of those cases in

9     our reply brief at page 5.

10          THE COURT:  And would that information be publically

11     available to the Plaintiffs?

12          MR. HOXIE:  They are relying solely on the 10-k.  It

13     could be publically available.  They just have failed to

14     include any of that analysis in their complaint, in contrast to

15     the other cases that they discuss that usually have charts

16     broken out containing all of the pertinent information.

17          Instead they try to rely on a misreading of Insight's

18     form 10-k for 2006.  They say that the company made admissions

19     that the company did not admit.  The company did not admit in

20     that form 10-k that any of the five director -- directors that

21     the Plaintiff now has the burden of showing were either

22     interested or lacks independence, were involved in any

23     backdating scheme.

24          The 10-k disclosed, based on the Options Subcommittee

25     investigation, that many of the grants during the period were

1    properly issued, and that others needed corrected measurement

2    dates for reasons having nothing to do with backdating.

3           Moreover, the 10-k does not disclose any finding by

4    the Options Subcommittee that any of the comp -- that any

5    Compensation Committee member during the relevant two and a

6    half year period in this case, or during the entire ten year

7    period was involved in option backdating.

8           And in fact one of the reasons for some of the

9    measurement date correction was the subcommittee's inability to

10   confirm that the compensation approval of certain grants where

11   that, where the plan required such approval had in fact taken

12   effect.

13          Now does the second amended complaint in light of

14   Insight's exculpation provisions in its corporate charter come

15   close alleging the facts needed to show that any of the four

16   directors who from time to time served on the Compensation

17   Committee knowingly approved backdated options, a scienter

18   element that this Court already has held is required to cast

19   doubt on any comp committee member's disinterestedness.

20          And about all the Plaintiff can rely on is that at

21   various times during this two and a half year period four

22   directors served on the comp committee, but we've already been

23   down this road and Your Honor has already held that merely

24   alleging committee service is insufficient under Rule 23.1.

25          We cite several cases, Computer Sciences, the

1    DiLorenzo case and the Desimone cases in our motion at page 11

2    to 13 and in our reply brief at pages 4 to 5 where similar

3    pleading deficiencies were rejected for purposes of determining

4    whether a plaintiff had adequately pleaded demand futility.

5            So unless the Court has any other questions, Insight

6    would request that this latest second amended complaint be

7    dismissed with prejudice for failing to comply with the

8    applicable demand futility pleading requirements.

9            THE COURT:  Thank you, Mr. Hoxie.

10           Mr. Glennon.

11           MR. GLENNON:  Good afternoon, Your Honor.  Brian

12   Glennon on behalf of the individual defendants.

13           Your Honor, we've joined the company's motion to

14   dismiss and for the reasons set forth in that motion and as

15   explained by Mr. Hoxie here this afternoon.  The complaint

16   fails to establish demand futility with the required factual

17   particularity under the controlling Delaware law.

18           In addition, I also would like to focus just on three

19   brief issues that are unique to our motion to dismiss.  The

20   first is the statute of limitations.  There's no dispute that

21   Plaintiff's claims are governed by a three year statute of

22   limitations period.  We've made that argument.  They've

23   responded and agreed in their opposition brief.  There's no

24   dispute that the backdating period as alleged in this case

25   ended in 2005.

1          Now to overcome these facts, the Plaintiff has

2   advanced a variety of tolling arguments, equitable tolling and

3   fraudulent concealment.  But as you look through the complaint,

4   the unavoidable question is how is it that the facts were

5   concealed from Mr. Baca for all of these years, but Mr.

6   Apotheker, another shareholder who stands in the same shoes as

7   Mr. Baca for purposes of derivative litigation, was able to

8   assert the same claims against many of the same defendants in

9   September of 2006.  The complaint offers no answer to that

10  question, and neither does the opposition brief.

11         Point number 2, the failure to plead fraud with

12  particularity, again there's no dispute that the stock option

13  backdating claims sounded a fraud and therefore must comply

14  with Rule 9(b).

15         But as Mr. Hoxie pointed out, the complaint fails to

16  identify a single backdated stock option.  Not one.

17         Now that point is important for the reasons Mr. Hoxie

18  explained in the sense that it instantly distinguishes this

19  case from Ryan v. Gifford, Conrad v. Blank, Weiss v. Swanson;

20  all embody Delaware case law in which a plaintiff was able to

21  allege demand futility in a stock option backdating claim.

22         But it's also decisive in the 9(b) context because

23  without identifying a single backdated stock option, it's

24  impossible to determine from the face of the complaint who was

25  responsible for backdating stock options, who authorized

1    backdating stock options.

2           As Your Honor noted in the prior dismissal order, the

3    compensation committee members changed over the course of the

4    ten year period, and again it's impossible to determine who

5    even received a backdated stock option.  The complaint simply

6    includes a table listing option grants without identifying

7    which if any at all were backdated.  And the Court already

8    rejected that approach in dismissing the prior complaint.

9           Now a moment ago you asked Mr. Hoxie if that

10   information would be publically available, and the answer is

11   yes.  A plaintiff can recreate and determine which stock

12   options were backdated, and I would point Your Honor to <u>Ryan v.</u>

13   <u>Gifford</u> where the court makes that observation.  In fact, the

14   plaintiff used public filings and used a statistical analysis

15   to determine which option grants outperformed the market on an

16   annualized basis and was able to determine which stock options

17   were backdated.

18          But let's just for hypothetical purposes assume that

19   that information is not publically available.  The bottom line

20   is the 2006 10-k was published in July 2007, and Plaintiff had

21   means available to him to investigate those claims, and to get

22   the very information he's claiming he had no access to.

23          As Your Honor knows, he recently sought a books and

24   records inspection in Delaware.  He didn't seek backdated stock

25   option information in that request, nor in any other request in

1    the last three years.

2           I should note that just last week Vice Chancellor

3    Lassiter (phonetic) dismissed the books and records action on

4    the grounds that Plaintiff did not have a proper purpose to

5    seek the inspection of books and records.

6           But the elephant in the living room I guess is this.

7    If the claim -- if the stock option backdating facts that

8    Plaintiff needs weren't publically available, why hasn't

9    Plaintiff taken the steps necessary to plead his claims with

10   the factual particularity required under Rule 23.1 and Federal

11   Rule 9(b) in the three years since the 10-k disclosure on which

12   he relies was published?

13          And I would submit your answer -- Your Honor that I

14   think the answer is because this really never was a backdating

15   case.  This was an age trade credit case, and the backdating

16   claims seemed to work themselves in to bolster a demand

17   futility argument.  And it wasn't until after there was -- the

18   trade credit claims went away we find ourselves here some three

19   years later with the Plaintiff still relying on a public filing

20   from July of 2007 without any indication, in the complaint or

21   otherwise, that he has done anything else to investigate those

22   claims.

23          My third and final point, Your Honor, is the business

24   judgment rule.  The remainder of  Plaintiff's claims implicate

25   business judgment.  Those claims are the payment of excessive

1   executive bonus compensation, and the failure to recover or

2   recoup those bonus payments or backdated stock option

3   compensation.

4        The critical pleading failure here is that Plaintiff

5   fails to identify even who was responsible for making those

6   decisions, and Plaintiff doesn't even attempt to explain what

7   information was available to the Defendants who made those

8   decisions.

9        And the reason why those omissions are critical is

10  because the Plaintiff cannot allege that those decisions were

11  made on an uninformed basis by interested directors such that

12  the decision was tainted by self interest, or made in bad

13  faith.  The facts are not there to overcome presumption of the

14  business judgment rule at the pleading stage.  The details and

15  the authorities for each of these points are set forth in our

16  papers.

17       And unless Your Honor has any further questions for

18  me, I will sit down and reserve whatever additional time I may

19  have, if needed, for rebuttal.

20       THE COURT:  Thank you, Mr. Glennon.

21       Ms. Scolnick.

22       MS. SCOLNICK:  Good afternoon, Your Honor.  It's Judy

23  Scolnick for -- with the firm Scott & Scott and I represent

24  Robert Baca.

25       THE COURT:  I'm going to start with Mr. Baca's stock

1   ownership.  That would seem to be a really simple thing to

2   allege, and yet it's not alleged simply.  It wasn't clearly

3   alleged in the first amended complaint, and now it says he's

4   the beneficial owner of 200 shares, and it attaches some

5   redacted piece of paper from Morgan Stanley Smith Barney that

6   doesn't -- I don't know what it shows, but it seems to identify

7   him as a trustee, which is not usually the beneficial owner.

8   And I'd raise this because it would seem like that would be a

9   really easy thing to allege and make it clear whether he's a

10  stock owner or not a stock owner.  Why is that not clear, and

11  it leads into other things that lack clarity in the second

12  amended complaint that seem like they could be alleged in a

13  clear fashion?

14          MS. SCOLNICK:  I agree with you that the stock option

15  ownership is a simple question.  He is the beneficial owner of

16  200 shares, and I think that --

17          THE COURT:  So why did you attach a piece of paper

18  that makes that unclear?

19          MS. SCOLNICK:  I think -- when we were filing the

20  second amended complaint he was ill, and we were working

21  through his local counsel, and we didn't get -- we considered

22  it to be sufficient.  We had a tight deadline and we didn't get

23  all the papers that we would have gotten if there was more open

24  communication with him

25          But I think Mr. Hoxie removed that item from his

1    agenda of items because --

2         THE COURT:  No, I'm asking.  I'm asking, because

3    it's, to me, an example of something that isn't clear in the

4    second amended complaint, along with many other things, and of

5    all of the things that could clearly be alleged, it would seem

6    like the Plaintiff could clearly say, "I own 200 shares that I

7    bought on such-and-such a date," or, "I'm the beneficial owner

8    under my estate planning trust," or, "I'm a beneficial owner of

9    shares that were purchased and I was made the beneficiary by

10    somebody."

11         I mean, I have no idea what this means, and it should

12    be so easy.  We shouldn't even have to discuss it.

13         MS. SCOLNICK:  Right.

14         No, I agree with you, and you asked me why, and that

15    was really the reason that we were -- that that part did not

16    get the sufficient attention that we expected to give it when

17    we could not have much access to Mr. Baca at all, who is doing

18    well now.

19         As far as the other non-specific, I'll come right to

20    what the Defendants raise and what I suspect you're troubled

21    by, that we didn't list what we believed to be suspicious stock

22    options.

23         THE COURT:  Exactly.

24         MS. SCOLNICK:  I thought that might be an issue.

25         And Your Honor, there's two reasons why we didn't do

1  it.  One is because -- and this is the most important, most

2  likely; we don't have to do it.  Their -- the backdating was so

3  huge at Insight that we were -- it's different than the

4  ordinary case.

5          THE COURT:  Well, wait.  Don't say it was so huge at

6  Insight.  Tell me what causes you to believe -- what do I have

7  to look at that alleges that it was so huge?

8          I mean, this was like when I believe you said the age

9  trade credits were so huge.  Well they weren't so huge by every

10  measure.  They may have looked like a lot, but it turns out

11  they were really tiny in comparison to revenues.

12          I mean it -- what do you mean by "so huge"?  And so

13  huge is not a sufficient allegation.  I don't --  I'm not

14  suggesting you said so huge, but you did just now.

15          MS. SCOLNICK:  There were 957 grants dates, 28,000

16  option grants, 28 million shares that were backdated by -- we

17  know this because of the Defendants' admission, not this only

18  are allegation, because of the Defendants' admissions.

19          THE COURT:  Tell me what paragraph I should be

20  looking at that says that specifically?

21          MS. SCOLNICK:  I know it's in the attachment which

22  is --

23          THE COURT:  I'm looking at page 27, just

24  coincidentally it opened, that just has those same numbers in

25  it.  And this is -- I believe you're quoting from this --

1          MS. SCOLNICK:  That's correct.

2          THE COURT:  -- July 2000 filing after the stock

3    options investigation was completed.

4          MS. SCOLNICK:  That's correct.  Where it's quoting

5    from the December 31st, 2006 10-k filed on July 25th, 2007.

6    This is where the Defendants tell us that they looked at --

7    they looked at 28,000 individual option grants on 957 separate

8    grant dates, and it cost them about $15 million to look at

9    that.

10         He --

11         THE COURT:  But where does it say they were all

12   backdated?

13         MS. SCOLNICK:  Many -- no, I'm sorry -- many of --

14   that's what you put, that many of which were backdated.

15         But to do an analysis, Your Honor, under the Merrill

16   Lynch analysis --

17         THE COURT:  But where does this say, you allege, that

18   these were backdated?

19         MS. SCOLNICK:  What the -- the reason we didn't do

20   analysis is because to do an analysis properly, and many cases

21   say this, is you can't cherry pick stock options that you think

22   are backdated because they look suspicious.  That tells you

23   nothing.  Statistically that gives you no information.  You

24   have to look at all the stock options granted during the

25   backdating period and see whether it's not just random that

1    there are many that fall on the lowest or lower dates, the

2    lower share price dates.

3              And so to do the analysis correctly, we would have

4    had to look at 957 separate grant dates, just like the

5    Defendants did, and at --

6              THE COURT:  But did you identify even one backdated

7    stock option?

8              MS. SCOLNICK:  Yes, but it would --

9              THE COURT:  Where?

10             MS. SCOLNICK:  Oh, did we or could we?

11             THE COURT:  Did you allege --

12             MS. SCOLNICK:  No, we didn't.

13             THE COURT:  -- even one?

14             MS. SCOLNICK:  We -- yes -- well it depends on how

15   you read it.  We did not allege one stock option that our

16   worthless analysis, because we didn't have the time or the

17   money to analyze 957, so we didn't say one grant looks

18   suspicious to us.

19             What we did though is we alleged -- we took the

20   Defendants at their word.  They are the ones that wrote the 10-

21   k, and in their 10-k they said what the backdating period was.

22   They said it was -- it ended on November 30th, 2005, and began

23   in January of  1994.

24             And they are entitled --

25             THE COURT:  But that's not what I read that they

1    said.  They said that was the period that this committee was

2    appointed investigated and made a report about --

3              MS. SCOLNICK:  Yes.

4              THE COURT:  -- as a result of the filing of the state

5    court shareholder derivative action.

6              MS. SCOLNICK:  And as a result also of the SEC

7    investigation, and what they were trying to do when they wrote

8    this 10-k was to satisfy the SEC so that there wouldn't be a

9    prosecution.

10             THE COURT:  And apparently they did?

11             MS. SCOLNICK:  Apparently they did, because they

12   admitted that there was backdating stock option, and the SEC

13   did not go further with it because they got an admission.

14             What -- the relevant period -- Your Honor, the

15   relevant period that they said was January 1994 to December of

16   2005.  Now that doesn't mean nothing.  That means that

17   backdating occurred.

18             But they wrote this.  They are the master of the 10-

19   k.  They wrote it as carefully, as scrupulously as they

20   possibly could, and what they said is so interesting because

21   for the compensation committee backdating with the top three

22   officials, they said this occurred during the relevant period.

23   That's their language, that during the relevant period the

24   company followed a practice of requiring compensation committee

25   approval of the stock option awards to the three highest

1    ranking executives of the company during the comp -- relevant

2    period.

3          There's a lot of cases, <u>Phoenix Air</u> is one, and <u>Engel</u>

4    (phonetic) is another, that says when the defendants say what

5    the period is, Plaintiffs are entitled to a reasonable

6    inference that they are telling the truth.  So, what -- and

7    what's -- so we're entitled to believe what they said, that

8    this occurred during the relevant period.

9          But you might say, "That's just the period that they

10   investigated it.  And we're just saying that they're not just

11   saying it because when they meant a portion of the period, a

12   portion of the relevant period, they said it; they said exactly

13   that.

14         When they were talking about the backdating stock

15   options that occurred in non- , not for discretionary graphs,

16   which the compensation committee did, but for anniversary and

17   for promotion grants, this is what they said.

18         "During a portion of the period under review

19   retrospective selection occurred for anniversary grants, during

20   a portion," so they knew how to say it if they wanted to say

21   it.

22         If the backdating, intentional backdating by the

23   compensation committee, did not occur during the entire

24   relevant period, you can bet that they would have limited that

25   statement to as narrow as it could possibly be.

1          THE COURT:  Let's talk for a moment about a different

2    relevant period, the period during which Mr. Baca supposedly is

3    the beneficial owner of 200 shares, and that period is 2002.

4    How can I conclude from the allegations in the complaint that

5    even if there was backdating, it happened between 2002 and

6    2005?

7          MS. SCOLNICK:  Because as it -- right.  He bought his

8    stock in July of 2002, so how did it occur in those two and a

9    half years, as Mr. Hoxie said?  Maybe it never did.  You can

10   make a reasonable inference, which is all that the statistical

11   analysis does, it presents a reasonable inference.  We have a

12   reasonable inference through their admission, which is really

13   better evidence than a statistical analysis.

14          The reasonable inference is they set the relevant

15   period.  They said during the relevant period there was

16   backdating for the top three executives by the compensation

17   committee, and in our chart on paragraph 68, page 17, we show

18   the number of stock option grants and the potential realizable

19   value assigned to them through the proxy for all the years.

20          And as you could see, 2002 and 2004 were very big

21   years for Eric and Tim Crown in 2002, and 2004 for Tim Crown in

22   particular, and it is a reasonable inference that since they

23   said they intentionally backdated during that period, they did,

24   and these prox -- it's reasonable inference that they did in

25   those heavy hitting option years.  It's not a hundred percent

1   certainty that they did, but it is much better than you get in
2   most of the cases of a statistical analysis.
3           And why I said before that it was huge, I apologize
4   for that comment, for an imprecise comment, but it's just that
5   the amount of backdating, 959 grant dates, would be so
6   voluminous for us to analyze, and you're --
7           THE COURT:  But -- well, that's grant dates of which
8   perhaps a small number were backdated.
9           MS. SCOLNICK:  Well it's unlikely a small number
10   given the amount of the restatement, and given the fact that
11   they said many of these options -- their language again, not
12   mine -- many of these options were backdated.
13           And they said there were primarily three reasons,
14   primarily three reasons why they're updated -- I'm sorry;
15   backdated.
16           Two of them were sort of sloppy accounting kind of
17   reasons.  It could be negligence, and we're not pressing on
18   that.  But the third of the primary reasons was retrospective
19   selection of dates.
20           Your Honor, at the time that they were saying
21   retrospective  selection of dates, the time that they were
22   doing that, which you cannot possibly do innocently.  If you're
23   retrospectively selecting, you are intentionally backdating.
24           At the time that through their statement that they
25   were doing that, through 2005, they were saying something to

1  the public which was the exact opposite, "We do not issue stock

2  options at exercised prices below the market value at the date

3  of the grant."  They -- that's what they said in their 10-ks,

4  2003, 2004, signed by all four members of the compensation

5  committee, who at the very same time were backdating, and also

6  signed by Mr. Tim Crown.

7          So it's not just, "Oh, we're alleging just group

8  liability, committee membership; that's all."  It's not

9  committee membership, that's all; it's that they served on the

10 committee.  They lied.  They said something exactly opposite of

11 what they were forced in 2007 to admit that they were doing to

12 the public.

13         And the third one that just really nails the coffin

14 down is that they were -- it was that they -- you could not

15 delegate these backdated stock options, that you cannot -- you

16 could not delegate granting options to the top three committee

17 members.  It was a job only for the compensation committee, and

18 only the compensation committee did it.

19         So some of the other cases that find no liability

20 say, "Well, it maybe was delegated so how do we know that they

21 knew?"

22         THE COURT:  And let me just -- let's count directors

23 for our last subject here.

24         Of the Defendants in this case, four of the nine were

25 not on the board as of the end of this period in 2005.

```
 1              MS. SCOLNICK:  Uh-huh.

 2              THE COURT:  So one could not assert demand futility

 3    as to those four.

 4              MS. SCOLNICK:  That's correct on the backdating

 5    portion.  Different on the waste, but I'll preserve my time.

 6    On the backdating I completely agree.

 7              THE COURT:  So if there's one more disinterested

 8    director  among these nine, then there can't be demand

 9    futility.

10              MS. SCOLNICK:  No, Your Honor, the case law in

11    Delaware is different.  If it's an evenly membered board, like

12    ten even --

13              THE COURT:  Maybe I got it wrong.  Are there -- I

14    didn't count again -- are -- is it there were nine then and

15    there are ten now, or --

16              MS. SCOLNICK:  There are ten now.

17              THE COURT:  There are ten now; so I need two more.

18              MS. SCOLNICK:  You need -- well, you need five.  You

19    just need five.  On an even board it does not have to be a

20    majority.  It's if the --

21              THE COURT:  Didn't I just say that we only need one

22    more, and you said I was wrong?  Because we had four --

23              MS. SCOLNICK:  We have -- you're saying we have four

24    interested or four not interested?

25              THE COURT:  Four disinterested, because they weren't
```

24

```
 1    part of the board --

 2              MS. SCOLNICK:  Right.

 3              THE COURT:  -- until after the alleged stock option

 4    backdating ended.

 5              MS. SCOLNICK:  Right.

 6              THE COURT:  So there only has to be one more

 7    disinterested --

 8              MS. SCOLNICK:  Right.

 9              THE COURT:  -- member of the board to make it clear

10    that there can't be demand futility.  You agree?

11              MS. SCOLNICK:  No.

12              THE COURT:  Why not?

13              MS. SCOLNICK:  Because if there is one more, then we

14    have five disinterested and five interested.   If we have five

15    interested, there is demand futility.

16              THE COURT:  Oh, okay, then --

17              MS. SCOLNICK:  That's what I meant by the case law

18    is --

19              THE COURT:  That's why I said we need six.

20              MS. SCOLNICK:  We need five.

21              THE COURT:  Oh, I'm on the opposite side of you.

22              MS. SCOLNICK:  I see.

23              THE COURT:  I'm on the side that says you're supposed

24    to make a demand --

25              MS. SCOLNICK:  Right.
```

```
 1              THE COURT:  -- and so you have -- so your suggestion
 2    is they need six of these defendants to be disinterested in
 3    order for you to be required to have made a demand?
 4              MS. SCOLNICK:  That's right.
 5              THE COURT:  So --
 6              MS. SCOLNICK:  That's right.  Exactly right.  I see.
 7    We're saying it on different ends.  And we do have five.  I
 8    agree with Mr. Hoxie.  I agree with his head count.  We have
 9    five.  We have the four compensation committee members who lied
10    to the public at the time they were intentionally backdating,
11    and they did not delegate their job of stock options.  It was
12    them.  They can't say, "Oh, someone else did it, so we don't
13    know."
14              They could say that for some of them, like you said.
15    Some of them maybe were sloppy accounting.  But they admitted
16    that some of it was intentional by this four member
17    compensation committee.  They admitted it.
18              And they admitted when it occurred.  They didn't say
19    for a portion of the period.  They said for the whole period.
20    For the relevant period, is what they said.
21              All we're doing is believing them.  They are
22    scurrying away from their own language and saying, "Oh, we have
23    to do this, and this and this."  They admitted enough that we
24    know we have four.
25              Now then there's Tim, Tim Crown --
```

1          THE COURT:  Okay, but your time is up.

2          Thank you, Ms. Scolnick.

3          MS. SCOLNICK:  Thank you, Your Honor.

4          THE COURT:  I do have a question about this language.

5     Is the phrase, "The use of hindsight to select, exercise

6     prices" something that could be interpreted to mean anything

7     other than backdating?

8          MR. HOXIE:  I don't think so, Your Honor, but the --

9          THE COURT:  Oh, good.

10         MR. HOXIE:  -- key point there is that for demand

11    futility purposes the relevant portions of the 2006 form 10-k

12    that we attached and made part of our request for judicial

13    notice does not contain any admission that any of the four

14    people who at various times served on the comp committee

15    knowingly approved or received any backdated options, so --

16         THE COURT:  Well as I recall, some of the people

17    didn't get options, backdated or not.

18         MR. HOXIE:  Some did not.  And in fact the chart to

19    which Counsel made reference during her remarks at page 17 of

20    the second amended complaint, and as Your Honor honed in on the

21    only relevant sub period of the big period 2002 through 2005,

22    in 2002 in that chart there's reference to only one of the ten

23    directors that we're counting today.  In 2003 there's zero of

24    the pertinent ten directors.  In 2004 there's only one

25    director, and in 2005 again there's zero directors, so that's,

1   you know, very significant for the demand futility problems

2   that they're trying to overcome.

3           And you're right on the math.  They have to show that

4   the five remaining directors either knowingly received or

5   knowingly approved backdated options.  And they have not --

6           THE COURT:  We can't -- I'm fairly confident that

7   nobody could say received.

8           MR. HOXIE:  Right.  They keep talking about Tim

9   Crown, that it just has to be statistically that he received

10  backdated options.  That's what they say.

11          THE COURT:  Because he just got so many.

12          MR. HOXIE:  But, first of all, when you carve out

13  that three-quarters of the period when he didn't own stock, now

14  you're down to the remaining two and a half years, and there's

15  nothing on those charts that showed that any option grants he

16  received, and knowingly received, were backdated.

17          There were lots of options, lots of options granted

18  over this ten year period of time, but that really ties into

19  the point Mr. Glennon was making, and that is if it's not

20  apparent from the 2006 form 10-k or any other publically filed

21  documents, then it's incumbent upon a derivative plaintiff who

22  purportedly is trying to sue on behalf of the corporation to

23  use other tools at hand to do a sufficient investigation.

24          THE COURT:  They can't say they don't have the time

25  or money?

1          MR. HOXIE:  They cannot say that, and here they

2     actually did start to spend the time and incur, or spend the

3     money and incur the time, because later they started a Delaware

4     § 220 action, and as Mr. Glennon alluded to, that was dismissed

5     on June 3.  That complaint was dismissed by the chancery court

6     in Delaware, which made it very clear that it was inappropriate

7     for them to try to use that action after they had run into

8     court here and brought their derivative complaint.

9          I think those are the key points I wanted to make.

10    There's clearly no admission in the form 10-k as to any of the

11    four comp committee members that we talked about in my opening

12    remarks.

13          And this case is not -- it's just totally different

14    from Ryan v. Gifford, and the Conrad v. Blank case.  In Ryan v.

15    Gifford, for example, you only had a six person board, and it

16    was conceded that three on the comp committee approved the

17    option grants that were backdated, and a fourth received them,

18    so you clearly got to the majority on disinterestedness.

19          And in the Conrad case you had a ten person board.

20    Two conceded they received backdated options and the other

21    three it was conceded had approved them, so you got to the

22    five, five of ten, which under Delaware law equals a majority

23    on disinterestedness.  And you just don't have that here.  It's

24    just not here.

25          THE COURT:  So you say it's five, not six?

1      MR. HOXIE:  We're saying that if they can show that

2   five are -- there's reasonable doubt that five are

3   disinterested or lack independence, then that's all they have

4   to do.

5          But here, since four didn't even join the board till

6   after the period, and then you had the fifth, Ms. Pushor, who

7   in their opposition brief they don't say anything about her,

8   you're down to the final five, and if any one of those falls

9   out they're dead.

10         And the only one they really try to circle around is

11  Mr. Crown, and then the other four they just say, "At various

12  times were on the comp committee," and since they don't have a

13  specific backdated grant, that's problematical for them, and --

14         THE COURT:  Nor the receipt of options by all four of

15  the four.

16         MR. HOXIE:  Right.  And that's not in there, either.

17  That's not in their chart.

18         THE COURT:  Well I recall previously when we looked

19  at a chart in the first amended complaint, we also didn't have

20  these outside directors getting stock options or any --

21         MR. HOXIE:  Correct.

22         THE COURT:  -- any allegation that they received any

23  stock options during the -- any relevant period.

24         MR. HOXIE:  Correct.

25         THE COURT:  All right.  Thank you, Mr. Hoxie.

1          MR. GLENNON:  Thank you, Your Honor.  Just two very

2     quick points.  I can be brief.

3          Just with regards to the question as to whether or

4     not it needs to be a majority or five on a ten member board,

5     Beam v. Stewart, York v. Beneville, it's five members of a ten

6     member board.  In other words, a majority of an odd number

7     board, half of an even number board, and that those two

8     Delaware decisions speak to that particular issue.  Beam v.

9     Stewart is the most recent.

10          But I want to explain just briefly why Plaintiff's

11     swing at the four compensation committee members comes nowhere

12     close.  Two points on that.

13          Plaintiff's counsel stood here a few minutes ago and

14     argued that the 10 k admitted that the compensation committee

15     had approved these backdated stock options.

16          Now I am reading from Exhibit D to our request for

17     judicial notice at pages 13 and 14.  Excuse me; pages 15 and

18     16.  The option subcommittee's finding not only doesn't support

19     that allegation.  It flatly contradicts it.

20          At page 15 in the highlighted text it says:

21          "The company determined that the original recorded

22     date could not be relied on because there was correspondence or

23     other evidence that indicated that not all of the approvals had

24     been obtained, including for certain grants compensation

25     committee approval."

1            On the next page, page 16 again of Exhibit D, and I
2    should note that Plaintiff has not objected to our request for
3    judicial notice, not can he considering his reliance on this
4    document.  The second highlighted portion:
5               "For some grants, the compensation committee
6               minutes did not indicate approval of an award.  In
7               other instances the company either did not locate
8               minutes, or the evidence was inconclusive considering
9               -- concerning when a specific meeting occurred."
10           The reason why I think that language is so important
11   is that one of the issues identified with the stock option
12   grants under review wasn't backdating; it was incomplete
13   approvals.  It says that right at the very beginning of the
14   committee's findings.
15           And that makes it even more important for the
16   Plaintiff to identify which stock options were backdated and
17   approved by the compensation subcommittee.  Now, excuse me; the
18   compensation committee, because the 10-k does not support the
19   inference that all of the stock options granted during the
20   period of time were approved by the compensation committee.
21           The other point that I wanted to just briefly make is
22   Plaintiff argues --
23           THE COURT:  But the --
24           MR. GLENNON:  Yes?
25           THE COURT:  Under the corporate bylaws, all stock

1    option grants are supposed to be approved by the compensation

2    committee; correct?

3            MR. GLENNON:  No.  Certainly the grants to the top

4    three executive officers, but there were other discretionary

5    grants that could be delegated, and in fact the findings later

6    on the same page I was just citing you to talks about the CEO

7    had the authority to grant certain options, and he delegated

8    that down to business units and the like.

9            But to come back to your question, let's assume that

10   the compensation committee was required to make these approvals

11   and they didn't.  What does that mean?

12           It doesn't mean a fraud.  It could mean negligence.

13   It could even mean gross negligence.  But that would be

14   exculpated under the articles of incorporation.  But it doesn't

15   mean intentional backdating.  It doesn't mean fraud.  And

16   Plaintiff cannot rely on this document to suggest that the

17   compensation committee approved any backdated stock options,

18   much less all of them.

19           The last point I wanted to make, Your Honor, is when

20   we are talking about the compensation committee, Plaintiff is

21   always talking about them as consisting of four members,

22   Defendants Gunning, Jones, Fisher, and Dorrance.  But if you

23   look at the complaint, the table which illustrates committee

24   service, there were only four members on the compensation

25   committee during two of the ten years under review.  During the

1    vast majority of the time there was two or three directors who

2    served on that committee, so in the context of a complaint that

3    must plead particularized facts to satisfy both Rule 23.1 and

4    Rule 9(b), Plaintiff --

5              THE COURT:  Oh, so we have Gunning, Jones, and Fisher

6    in 2002 and 2003 --

7              MR. GLENNON:  Right.

8              THE COURT:  -- only, and then it's Gunning, Jones,

9    Fisher, and Dorrance in 2004 and 2005.

10             MR. GLENNON:  Right.  And the point that I'm trying

11   to make is not only is the Plaintiff assuming that the

12   compensation committee approved any backdated stock options,

13   and again, Plaintiff doesn't identify one, but they're also

14   assuming that it happened during this relatively limited window

15   of time when the compensation committee consisted of four

16   members.  We're always talking about this as if it was four

17   members, but it was only four members for two of the ten years.

18             These are just two of the points I wanted to

19   illustrate because they show the significant problems presented

20   by the generality with which Plaintiff is alleging a fraud

21   claim.

22             Unless Your Honor has any additional questions for

23   me, I'll sit down.

24             THE COURT:  Thank you very much, Mr. Glennon.

25             It's ordered taking this matter under advisement.

```
1              The Court is in recess.

2              THE CLERK:  All rise.

3         (Proceedings Concluded)

4

5

6

7

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**AVTranz**
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

```
 1                          CERTIFICATE

 2

 3   I certify that the foregoing is a correct transcript from the

 4   electronic sound recording of the proceedings in the above-

 5   entitled matter.

 6

 7

 8    Dated: June 16, 2010              Sally h. Cole
                                        AVTranz
 9                                      845 N. 3rd Ave
                                        Phoenix, AZ  85003

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```